CALIFORNIA *v.* CENTRAL PACIFIC RAILROAD CO.

SAME *v.* SOUTHERN PACIFIC RAILROAD CO.

SAME *v.* NORTHERN RAILWAY CO.

SAME *v.* CALIFORNIA PACIFIC RAILROAD CO.

SAME *v.* CENTRAL PACIFIC RAILROAD CO.

SAME *v.* CENTRAL PACIFIC RAILROAD CO.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF CALIFORNIA.

Nos. 660, 661, 662, 663, 664, 1157. Argued January 11, 12, 13, 1888. — Decided April 30, 1888.

By the constitution of California two modes of assessment for taxation
are prescribed: one, by a state board of equalization; the other, by
county boards and local assessors. All property is directed to be assessed
in the county, city, etc., in which it is situated, except that the franchise,
roadway, road-bed, rails, and rolling-stock of any railroad operated in
more than one county, are to be assessed by the state board, and appor-
tioned to the several counties, etc. By an act of the legislature the state
board is required to include in their assessment steamers engaged in
transporting passengers and freights across waters which divide a rail-
road. This act was held by the Supreme Court of California, in *San
Francisco* v. *Central Pacific Railroad Co.*, 63 Cal. 469, to be contrary to
the constitution, and steamboats were held to be assessable by the county

Statement of the Case.

board, and not by the state board. This court, following that decision. and that of *Santa Clara County v. Southern Pacific Railroad Co.*, 118 U. S. 394, *holds* that the assessment of the steamers of a railroad company by the state board is in violation of the constitution of California, and void: and, being inseparably blended with the other property assessed, it makes the whole assessment void.

The State Board of Equalization of California having included in their assessment all the franchises of a railroad company, amongst which were franchises conferred by the United States, of constructing a railroad from the Pacific Ocean across the State as well as across the Territories of the United States. and of taking toll thereon; *held*, that the assessment of these franchises was repugnant to the Constitution and laws of the United States and the power given to Congress to regulate commerce among the several States.

Franchises conferred by Congress cannot, without its permission. be taxed by the States.

Congress has authority. in the exercise of its power to regulate commerce among the several States, to construct, or authorize individuals or corporations to construct. railroads across the States and Territories of the United States.

THESE cases were argued together. They all involved the constitutionality of tax laws of the State of California, in many respects the same constitutional questions being presented as those which were argued (and not decided) in *Santa Clara County v. Southern Pacific Railroad Company*, 118 U. S. 394.

Each action was brought by the people of the State of California to recover a tax assessed upon the property and franchises of the defendant.

The provisions of the constitution and laws of the State of California, authorizing the suits. and which were relied upon to sustain the validity of the taxes, were stated in the brief of the Attorney General as printed in the margin.[1]

---

[1] Sections 1, 2, 4, 9, and 10. of Article 13, of the constitution of California, provide as follows :

" Section 1. All property in the State, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law. The word ' property' as used in this article and section is hereby declared to include moneys, credits, bonds, stocks, dues, franchises, and all other matters and things, real, personal and mixed, capable of private ownership; provided, that growing crops, property used exclusively for public schools, and such as may belong to the United States, this State, or to any county or municipal corporation within this State.

The answers of the defendants, although varying according to the facts in each case, substantially agreed in setting up in

---

shall be exempt from taxation. The legislature may provide, except in the case of credits secured by mortgage or trust-deed, for a deduction from credits of debts due to bona fide residents of this State.

" Section 2. Land and the improvements thereon shall be separately assessed, etc.

" Section 4. A mortgage, deed of trust, contract, or other obligation by which a debt is secured shall, for the purposes of assessment and taxation, be deemed and treated as an interest in the property affected thereby. Except as to railroads and other *quasi*-public corporations, in case of debts so secured, the value of the property affected by such mortgage, deed of trust, contract, or obligation, less the value of such security, shall be assessed and taxed to the owner of the property, and the value of such security shall be assessed, and taxed to the owner thereof, in the county, city, or district in which the property affected thereby is situate. The taxes so levied shall be a lien upon the property and security, and may be paid by either party to such security; if paid by the owner of the security, the tax so levied upon the property affected thereby shall become a part of the debt so secured; if the owner of the property shall pay the tax so levied on such security, it shall constitute a payment thereon, and to the extent of such payment, a full discharge thereof; provided, that if any such security or indebtedness shall be paid by any such debtor or debtors, after assessment and before the tax levy, the amount of such levy may likewise be retained by such debtor or debtors, and shall be computed according to the tax levy for the preceding year.

" Section 9. A State Board of Equalization, consisting of one member from each Congressional District in this State, shall be elected by the qualified electors of their respective districts at the general election to be held in the year one thousand eight hundred and seventy-nine, whose term of office, after those first elected, shall be four years, whose duty it shall be to equalize the valuation of the taxable property of the several counties in the State for the purposes of taxation. The Controller of State shall be *ex-officio* a member of the Board. The Boards of Supervisors of the several counties of the State shall constitute Boards of Equalization for their respective counties, whose duty it shall be to equalize the valuation of the taxable property in the county for the purpose of taxation; *provided*, such State and County Boards of Equalization are hereby authorized and empowered, under such rules of notice as the County Boards may prescribe. as to the county assessments, and under such rules of notice as the State Board may prescribe as to the action of the State Board, to increase or lower the entire assessment roll, or any assessment contained therein, so as to equalize the assessment of the property contained in said assessment roll, and make the assessment conform to the true value in money of the property contained in said roll. [This section was amended May 20, 1884,

addition to general denials, that the tax as assessed against each of them was not assessed in the same mode, and with

and one of the Central Pacific cases was commenced after the amendment took effect. But the counsel on both sides cited the section as here printed.]

" Section 10. All property, except as hereinafter in this section provided, shall be assessed in the county, city and county, town, township, or district in which it is situated, in the manner prescribed by law. The franchise, roadway, road-bed, rails, and rolling-stock of all railroads operated in more than one county in this State shall be assessed by the State Board of Equalization at their actual value, and the same shall be apportioned to the counties, cities and counties, cities, towns, townships, and districts in which such railroads are located, in proportion to the number of miles of railway laid in such counties, cities and counties, cities, towns, townships, and districts."

### Statutory Provisions.

Sections 3617, 3627, 3628, 3629, 3664, 3665, 3669, 3670, 3671, 3672, 3673, 3674, 3676, 3692, and 3693 of the Political Code of California provide as follows:

Section 3617, third subdivision:

" The term ' improvements,' includes — 1. All buildings, structures, fixtures, fences, and improvements erected upon or affixed to the land."

' Section 3627. All taxable property must be assessed at its full cash value. Land and improvements thereon shall be separately assessed. Cultivated and uncultivated land, of the same quality and similarly situated, shall be assessed at the same value. A mortgage, deed of trust, contract, or other obligation by which a debt is secured, shall, for the purposes of assessment and taxation, be deemed and treated as an interest in the property affected thereby, except as to railroad and other *quasi*-public corporations. In case of debts so secured, the value of the property affected by such mortgage, deed of trust, contract, or obligation, less the value of such security, shall be assessed and taxed to the owner of the property, and the value of such security shall be assessed and taxed to the owner thereof, in the county, city, or district in which the property affected thereby is situated. The taxes so levied shall be a lien upon the property and security, and may be paid by either party to such security; if paid by the owner of the security, the tax so levied upon the property affected thereby shall become a part of the debt so secured. If the owner of the property shall pay the tax so levied on such security, it shall constitute a payment thereon, and, to the extent of such payment, a full discharge thereof. If any such security or indebtedness shall be paid by any such debtor or debtors, after assessment and before the tax levy, the amount of such levy may likewise be retained by such debtor or debtors, and shall be computed according to the tax levy for the preceding year; and every contract by which a debtor is obliged to pay any tax or assessment on money loaned, or on any mortgage, deed of trust, or other lien, shall, as to any interest specified therein,

the same exemptions of their mortgaged property that was allowed to private individuals and other corporations, and

and as to such tax or assessment, be null and void. [In effect March 7, 1881.]

" Section 3628. The franchise, roadway, road-bed, rails, and rolling-stock of all railroads operated in more than one county in this State, shall be assessed by the State Board of Equalization, as hereinafter provided for. Other franchises, if granted by the authorities of a county, city, or city and county, must be assessed in the county, city, or city and county, within which they were granted; if granted by any other authority they must be assessed in the county in which the corporations, firms, or persons owning or holding them have their principal place of business. All other taxable property shall be assessed in the county, city, city and county, town, township, or district in which it is situated. Land shall be assessed in parcels or subdivisions not exceeding six hundred and forty acres each, and tracts of land containing more than six hundred and forty acres, which have been sectionized by the United States Government, shall be assessed by sections or fractions of sections. The assessor must, between the first Mondays of March and July in each year, ascertain the names of all taxable inhabitants, and all property in his county subject to taxation, except such as is required to be assessed by the State Board of Equalization, and must assess such property to the persons by whom it was owned or claimed, or in whose possession or control it was at twelve o'clock M. of the first Monday of March next preceding; but no mistake in the name of the owner or supposed owner of real property, shall render the assessment thereof invalid. In assessing solvent credits, not secured by mortgage or trust deed, a reduction therefrom shall be made of debts due to bona-fide residents of this State. [In effect March 22, 1880.]

" Section 3629. He must exact from each person a statement under oath, setting forth specifically all the real and personal property owned by such person, or in his possession or under his control, at 12 o'clock M. on the first Monday in March," etc. [In effect March 7, 1881.]

" Section 3664. The president, secretary, or managing agent, or such other officer as the State Board of Equalization may designate, of any corporation, and each person, or association of persons, owning or operating any railroad in more than one county in this State, shall, on or before the first Monday in April of each year, furnish the said Board a statement, signed and sworn to by one of such officers, or by the person or one of the persons forming such association, showing in detail for the year ending on the first Monday in March in each year:

" 1. The whole number of miles of railway in the State, and, when the line is partly out of the State, the whole number of miles without the State, and the whole number within the State, owned or operated by such corporation, person, or association;

" 2. The value of the roadway, road-bed, and rails of the whole railway, and the value of the same within the State;

that consequently they were denied the equal protection of the laws; and further that it was assessed without the notice

---

" 3. The width of the right of way;

" 4. The number of each kind of all rolling-stock used by such corporation, person, or association in operating the entire railway, including the part without the State;

" 5. Number, kind, and value of rolling-stock owned and operated in the State;

" 6. Number, kind, and value of rolling-stock used in the State, but owned by the party making the returns;

" 7. Number, kind, and value of rolling-stock owned, but used out of the State, either upon divisions of road operated by the party making the returns, or by and upon other railways.

" Also showing, in detail, for the year preceding the first of January :

" 1. The gross earnings of the entire road;

" 2. The gross earnings of the road in the State, and where the railway is let to other operators, how much was derived by the lessor as rental;

" 3. The cost of operating the entire [road], exclusive of sinking-fund, expenses of land department, and money paid to the United States;

" 4. Net income for such year, and amount of dividend declared;

" 5. Capital stock authorized;

" 6. Capital stock paid in;

" 7. Funded debt;

" 8. Number of shares authorized;

" 9. Number of shares of stock issued;

" 10. Any other facts the State Board of Equalization may require;

" 11. A description of the road, giving the points of entrance into and the point of exit from each county, with a statement of the number of miles in each county.  When a description of the road shall once have been given, no other annual description thereafter is necessary unless the road shall have been changed.  Whenever the road, or any portion of the road, is advertised to be sold, or is sold, for taxes, either state or county, no other description is necessary than that given by, and the same is conclusive upon, the corporation, power, or association giving the description.  No assessment is invalid on account of a misdescription of the railway or the right of way for the same.  If such statement is not furnished, as above provided, the assessment made by the State Board of Equalization upon the property of the corporation, person, or association failing to furnish the statement is conclusive and final.  [In effect March 9, 1883.]

" Section 3665.  The State Board of Equalization must meet at the state capitol on the first Monday in August, and continue in open session from day to day, Sundays excepted, until the third Monday in August.  At such meeting the Board must assess the franchise, roadway, road-bed, rails, and rolling-stock of all railroads operated in more than one county.  Assessment must be made to the corporation, person, or association of persons

given to individuals, and consequently that their property was taken without due process of law. Some of them set up that

owning the same, and must be made upon the entire railway within the State, and must include the right of way, bridges, culverts, wharves, and moles upon which the track is laid, and all steamers which are engaged in transporting passenger and freight-cars across waters which divide the road. The depots, stations, shops, and buildings erected upon the space covered by the right of way are assessed by the assessor of the county wherein they are situate. Within ten days after the third Monday of August the Board must apportion the total assessment of the franchise, roadway, road-bed, rails, and rolling-stock of each railway to the counties, or cities and counties, in which such railway is located, in proportion to the number of miles of railway laid in such counties, and cities and counties. The Board must also, within said time, transmit by mail, to the county auditor of each county, or city and county, to which such apportionment shall have been made, a statement, showing the length of the main track of such railway within the county, or city and county, with a description of the whole of the said track within the county, or city and county, including the right of way, by metes and bounds, or other description sufficient for identification, the assessed value per mile of the same, as fixed by a *pro rata* distribution per mile of the assessed value of the whole franchise, roadway, road-bed, rails, and rolling-stock of such railway within the State, and the amount apportioned to the county, or city and county. The auditor must enter the statement on the assessment-roll or book of the county, city and county, and where the county is divided into assessoral townships or districts, then on the roll or book of any township or district he may select, and enter the amount of the assessment apportioned to the county, or city and county, in the column of the assessment book or roll as aforesaid, which shows the total value of all property for taxation, either of the county, city and county, or such township or district. On the first Monday in October the Board of Supervisors must make, and cause to be entered in the proper record book, an order, stating and declaring the length of main track of the railway assessed by the State Board of Equalization within the county; the assessed value per mile of such railway, the number of miles of track, and the assessed value of such railway lying in each city, town, township, school and road districts, or lesser taxing district in the county, or city and county, through which such railway runs, as fixed by the State Board of Equalization, which shall constitute the assessed value of said property for taxable purposes in such city, town, township, school, road, or other district, and the clerk of the Board of Supervisors must transmit a copy of each order or equalization to the city council or trustees, or other legislative body of incorporated cities or towns, the trustees of each school district, and the authorized authorities of other taxation districts through which such railway runs. All such railway property shall be taxable upon said assessment, at the same rates, by the same officers, and for the same

they enjoyed franchises conferred by the United States, not taxable without the assent of Congress; and others that

purposes as the property of individuals within such city, town, township, school, road, and lesser taxation districts, respectively. If the owner of a railway assessed by the State Board of Equalization is dissatisfied with the assessment made by the Board, such owner may, at the meeting of the Board, under the provisions of section thirty-six hundred and ninety-two of the Political Code, between the third Monday in August and the third Monday in September, apply to the Board to have the same corrected in any particular, and the Board may correct and increase or lower the assessment made by it, so as to equalize the same with the assessment of other property in the State. If the Board shall increase or lower any assessment previously made by it, it must make a statement to the county auditor of the county affected by the change in the assessment of the change made, and the auditor must note such change upon the assessment book or roll of the county, as directed by the Board. [In effect March 9, 1883.]

" Section 3669. ·Each corporation, person, or association assessed by the State Board of Equalization, must pay to the state treasurer, upon the order of the controller, as other moneys are required to be paid into the treasury, the State and county, and city and county, taxes each year levied upon the property so assessed to it or him by said Board. Any corporation, person, or association, dissatisfied with the assessment made by the Board, upon the payment of the taxes due upon the assessment complained of, and the five per cent added, if to be added on or before the first Monday in February, and the filing of notice with the controller of an intention to begin an action, may, not later than the first Monday in February, bring an action against the state treasurer for the recovery of the amount of taxes and percentage so paid to the treasurer, or any part thereof, and in the complaint may allege any fact tending to show the illegality of the tax, or of the assessment upon which the taxes are levied in whole or in part. A copy of the complaint and of the summons must be served upon the treasurer within ten days after the complaint has been filed, and the treasurer has thirty days within which to demur or answer. At the time the treasurer demurs or answers, he may demand that the action be tried in the Superior Court of the county of Sacramento. The attorney general must defend the action. The provisions of the code of civil procedure relating to pleadings, proofs, trials and appeals are applicable to the proceedings herein provided for. If the final judgment be against the treasurer, upon presentation of a certified copy of such judgment to the controller he shall draw his warrant upon the state treasurer, who must pay to the plaintiff the amount of the taxes so declared to have been illegally collected. and the cost of such action, audited by the Board of Examiners, must be paid out of any money in the general fund of the treasury, which is hereby appropriated; and the controller may demand and receive from the county, or city and county, interested, the proportion of such costs, or may deduct

property had been included in the valuation in violation of the provisions of the constitution of California, thereby invalidating the whole assessment.

---

such proportion from any money then, or to become, due said county, or city and county. Such action must be begun on or before the first Monday in February of the year succeeding the year in which the taxes were levied, and a failure to begin such action is deemed a waiver of the rights of action. [In effect March 9, 1883.]

" Section 3670. After the first Monday of February of each year, the controller must begin an action in the proper court, in the name of the people of the State of California, to collect the delinquent taxes upon the property assessed by the State Board of Equalization; such suit must be for the taxes due the State, and all the counties, and cities and counties, upon property assessed by the Board of Equalization, and appearing delinquent upon the ' Duplicate Report of Apportionment of Railway Assessments.' The demands for state and county and city and county taxes may be united in one action. In such action a complaint in the following form is sufficient:

" (Title of court.)

The People of the State of California $\left.\right\}$
*v.*
(Naming the Defendant)

" Plaintiff avers that on the — day of — in the year (naming the year), the State Board of Equalization assessed the franchise, roadway, road-bed, rails, and rolling-stock of the defendant at the sum of (naming it) dollars. That the Board apportioned the said assessment as follows: To the county of (naming it) the sum of (naming it) dollars (and so on, naming each county).

" That the defendant is indebted to plaintiff for state and county taxes for the year eighteen — in the following sums: For state taxes, in the sum of (naming it) dollars, for county taxes of the county of (naming it), in the sum of (naming it) dollars, etc., with five per cent added for non-payment of taxes. Plaintiff demands payment for said several sums, and prays that an attachment may issue in form as presented in section five hundred and forty of the Code of Civil Procedure.

" (Signed by the controller or his attorney.)

" On the filing of such complaint the clerk must issue the writ of attachment prayed for, and such proceedings shall be had as under writs of attachment issued in civil actions; no bond nor affidavit previous to the issuing of the attachment is required. If on such action the plaintiff recover judgment there shall be included in the judgment as counsel fees, and in case of judgment of taxes, after suit brought but before judgment, the defendant must pay as counsel fees such sums as the court may determine to be reasonable and just. Payment of the taxes on the amount of the judgment in the case must be made to the state treasurer. In such actions

All the suits were commenced in a court of the State, and were removed on petition of the defendants to the Circuit

the duplicate record of assessments of railways and the duplicate record of apportionment of railway assessments, or a copy of them, certified by the controller, showing unpaid taxes against any corporation, person, or association for property assessed by the State Board of Equalization, is *prima facie* evidence of the assessment, the property assessed, the delinquency, the amount of the taxes due and unpaid to the State, and counties, or cities and counties, therein named, and that the corporation, person, or association is indebted to the people of the State of California, in the amount of taxes, state and county, and city and county, therein appearing unpaid, and that all the forms of law in relation to the assessment and levy of such taxes have been complied with.  [In effect March 9, 1883.]

" Section 3671.  The assessment made by the county assessor, and that of the State Board of Equalization, as apportioned by the Board of Supervisors to each city, town, township, school, road, or other district in their respective counties, shall be the only basis for taxation for the county, or any subdivision thereof, except in incorporated cities and towns, and may also be taken as such basis in incorporated cities and towns when the proper authorities may so elect.  All taxes upon townships, road, school, or other local districts shall be collected in the same manner as county taxes.  [In effect March 9, 1883.]

" Section 3672.  The Board of Supervisors of each county must meet on the first Monday of July in each year to examine the assessment book and equalize the assessment of property in the county.  It must continue in session for that purpose from time to time until the business of equalization is disposed of, but not later than the fourth Monday in July.  [In effect January 1, 1873.]

" Section 3673.  The Board has power, after giving notice in such manner as it may, by rule, prescribe, to increase or lower the entire assessment roll, or any assessment contained therein, so as to equalize the assessment of the property contained in said roll, and make the assessment conform to the true value of such property in money.  [In effect March 22, 1880.]

" Section 3674.  No reduction must be made in the valuation of property, unless the party affected thereby, or his agent, makes and files with the Board a written application therefor, verified by his oath, showing the facts upon which it is claimed such reduction should be made.  [In effect January 1, 1873.]

" Section 3676.  Upon the hearing of the application the Board may subpœna such witnesses, hear and take such evidence in relation to the subject pending, as in its discretion it may deem proper.  [In effect January 1, 1873.]

" Section 3692.  The powers and duties of the State Board of Equalization are as follows :

" 1.  To prescribe rules for its own government, and for the transaction of its business.

Court of the United States for what is now the Northern District of California. In each, judgment was rendered for

---

" 2. To prescribe rules and regulations, not in conflict with the constitution and laws of the State, to govern supervisors when equalizing, and assessors when assessing.

" 3. To make out, prepare, and enforce the use of forms in relation to the assessment of property.

" 4. To hold regular meetings at the state capitol on the second Monday in each month, and such special meetings as the chairman may direct.

" 5. To annually assess the franchise, roadway, road-bed, rails, and rolling-stock of all railroads operated in more than one county in this State, at their actual value, on the first Monday in March, at 12 o'clock M., and to apportion such assessment to the counties, and cities and counties, in which such railroads are located in proportion to the number of miles of railway laid in such counties, and cities and counties, in the manner provided for in section 3664 of said code.

" 6. To equalize the assessment of each mortgage, deed of trust, contract, or other obligation by which a debt is secured, and which affects property situate in two or more counties, and to apportion the assessment thereof to each of said counties.

" 7. To transmit to the assessor of each county, or city and county, its apportionment of the assessments made by said Board upon the franchises, roadways, road-beds, rails, and rolling-stock of railroads; and also its apportionment of the assessments made by such Board upon mortgages, deeds of trust, contracts, and other obligations by which debts are secured, in the manner provided for in § 3664 of said code.

" 8. To meet at the state capitol on the third Monday in August, and remain in session from day to day (Sundays excepted) until the third Monday in September.

" 9. At such meeting to equalize the valuation of the taxable property of the several counties in this State for the purpose of taxation; and to that end, under such rules of notice to the clerk of the Board of Supervisors of the county affected thereby as it may prescribe, to increase or lower the entire assessment roll, or any assessment contained therein, so as to equalize the assessment of the property contained in said roll, and make the assessment conform to the true value in money of the property assessed, and to fix the rate of state taxation, and to do the things provided in § 3693 of said code.

" 10. To visit as a Board, or by the individual members thereof, whenever deemed necessary, the several counties of the State, for the purpose of inspecting the property and learning the value thereof.

" 11. To call before it or any member thereof, on such visit, any officers of the county, and to require them to produce any public records in their custody.

" 12. To issue subpœnas for the attendance of witnesses or the production

the defendant, to review which the plaintiff below, in each case sued out a writ of error.

*Mr. J. M. Wilson* for plaintiffs in error. *Mr. Samuel Shellabarger* was with him on the brief.  *Mr. G. A. Johnson,* Attorney General of California, filed a brief for same.

The principal questions presented by these records are the following :

*First.*  Inasmuch as the constitution of California provides that in assessing property held by individuals for taxation the amount of encumbrances by mortgage is declared to be an interest in the property, and shall be assessed against the mortgage, and the value in excess of the mortgage shall be assessed against the owner; and inasmuch, as in cases of such corporations as the defendant, operating a railroad in more than one county of the State, no such division is provided for

---

of books before the Board, or any member thereof, which subpœnas must be signed by a member of the Board, and may be served by any person.

" 14.  To appoint a clerk, prescribe and enforce his duties.  The clerk shall hold his office during the pleasure of the Board.

" 15.  To report to the governor, annually, a statement showing :

" *First.*  The acreage of each county in the State that is assessed.

" *Second.*  The amount assessed per acre.

" *Third.*  The aggregate value of all town and city lots.

" *Fourth.*  The aggregate value of all real estate in the State.

" *Fifth.*  The kinds of personal property in each county, and the value of each kind.

" *Sixth.*  The aggregate value of all personal property in the State.

" *Seventh.*  Any information relative to the assessment of property and the collection of revenue.

" *Eighth.*  Such further suggestions as it shall deem proper.

" 16.  To keep a record of all its proceedings.   [In effect April 3, 1880.]

" Section 3693.  When, after a general investigation by the Board, the property is found to be assessed above or below its full cash value, the Board may, without notice, so determine, and must add to or deduct from the valuation :

" 1.  The real estate.

" 2.  Improvements upon such real-estate.

" 3.  The personal property, except money, such per centum respectively as is sufficient to raise or reduce to its full cash value."   [In effect April 3, 1880.]

or permitted; — is this a denial to that company of the equal protection of the laws as contemplated by the Fourteenth Article of Amendment to the Constitution of the United States?

*Second.* Inasmuch as neither the *constitution of the State* of California, nor any law of that State, (as is claimed by the defendant,) provides for any special notice to be given to the defendant, of such assessment, and makes no specific provision for a hearing before the Board of Equalization, but only such notice and right to be heard as might be implied from the existence of the laws making it the duty of the property owners to make returns, and the officers to assess and apportion; — does this amount to a taking of the defendant's property, in the shape of taxes, without "due process of law," as contemplated by the Fourteenth Article of Amendment to the Constitution of the United States?

*Third.* Is the property in question exempt from taxation because of its relations to the government of the United States?

*Fourth.* Is this tax void because the franchise was blended with the roadway, road-bed, etc., in making the assessment?

In the beginning of this discussion we desire to call the attention of the court to the fact that the assessment in question is upon the franchise, road-bed, roadway, rails, and rolling-stock of the defendant exclusively; that it does not embrace the value of the fences along the road, nor does it embrace any steamers used in connection with the business of said road, nor does it embrace any of the outlying lands granted to the company by the United States in aid of the construction of the road, and which are covered by the land-grant mortgage mentioned in the answer and findings of fact. The question, therefore, as to whether or not the method that may have been pursued by the State in assessing these outlying lands was a valid method, or whether the constitution and laws of the State of California in relation to and affecting the taxation of such lands are valid, is not involved in this record. And we have, therefore, to consider, in the discussion of this case, simply the question whether or not what has been done

under, or provided for, by the constitution and laws of California in respect to the assessment and taxation of the roadbed, roadway, rails, and rolling stock of corporations such as the defendant, is a violation of the provisions of the Fourteenth Amendment to the Constitution in the particulars referred to in the propositions hereinbefore stated. And it is to these that we invite the attention of the court.

When the constitution of the State was adopted, in 1879, this railroad company existed with its road completed, and with mortgages upon it quite equal to, if not in excess of, the assessable value of the property. And we venture to assume that the court will take judicial notice of so notorious a fact as that there were thousands of miles of railroad in that State, heavily mortgaged, many of the bonds of which were held outside of said State, and that could not be reached for taxation by assessments against the holders.

This property aggregated in value many millions of dollars — in this particular case alone, judging by the assessments, amounting to more than $20,000,000.

The aggregate of the assessments in the cases now before the court amounts to more than $50,000,000.

That this enormous amount of property should bear its fair proportion of the expenses of government will not be denied.

### The Right to tax and the Right to classify Property for Taxation.

Unless it can be maintained that the Fourteenth Article of Amendment has destroyed it, the State, in the exercise of its sovereign power, has the right not only to tax according to its discretion, but also to classify property for assessment and taxation.

What the State may do in that behalf has been stated by this court in *The Railroad Company* v. *Peniston*, 18 Wall. 5. See also, to the same effect, *Williams* v. *Supervisors of Albany*, 122 U. S. 154, 163, 164.

In the light of these opinions, the sovereign and absolute power of a State to impose taxes, and to determine the extent, the subjects upon, and the mode in which it shall be

exercised, cannot be disputed. If the right to classify even could have been the subject of reasonable disputation, it has been set at rest by the decision of this court in the *Kentucky Railroad Tax Cases,* 115 U. S. 321, in which this very question was presented and disposed of. See also *State Railroad Tax Cases,* 92 U. S. 575, at page 611.

It being, then, settled that the State may divide property into classes for the purposes of taxation — may make farming lands, city and town lots one class, and railroads, their franchises, roadway, etc., another class — it necessarily follows that if the State of California has made such a division or classification, she has not exceeded her sovereign authority by so doing. And it equally follows from this that the State must be the judge, and the *sole* judge, as to what classification shall be made within the limit of the power to classify. It can only become subject to legal criticism when what is done, or provided for, operates *unequally* upon different persons belonging to the *same class. Missouri* v. *Lewis,* 101 U. S. 22.

Now what has the State done? Its constitution and its laws in this respect cover "property." They provide for assessing in one class property not owned by railroads operating in more than one county, in the doing of which mortgages are to be deemed an interest in the property, and so assessed, and the value in excess of the mortgage is to be deemed an interest in the same property, and so assessed ; and in another class " property " *owned* by railroad companies operating in more than one county, as to which no such division is to be made. It is a distinct classification of " property," and not a classification of persons.

The railroad property is not taxed beyond its value, but, in taxing, it is not divided as property between the mortgagor (the company) and the mortgagee (the bondholder), and each taxed separately for his interest. Or, to state it yet differently, the mortgage in this case is not declared to be an interest in the railroad property, and the assessment is against the owner as to the entire value. Is this an unlawful discrimination?

The answer to this question, we submit, is found in the principles of law which control the powers and rights of sovereign

States to classify the property within the State for purposes of taxation. See *Stuart* v. *Palmer*, 74 N. Y. 189; *Wilkinson* v. *Leland*, 2 Pet. 627, 657, 658; *Terret* v. *Taylor*, 9 Cranch, 43; *Von Hoffman* v. *Quincy*, 4 Wall. 535, 550; *Sinking Fund Cases*, 99 U. S. 700, 719; *Bank* v. *Moher*, 20 Blatchford, 341; Cooley Const. Lim. 175, note 5, and cases there collected.

What is meant, therefore, to be designated by, and included in, this sovereign and unfettered power, discretion and right of choice, which is held by every State in making classification of property for taxation, is not the power to disregard the fundamental principles of free government and of private property rights; but this power does mean that the legislature, in making classification and imposing taxes, is (aside from limitations in the state constitution) subject to *no other* restraints, in the exercise of these high discretions, than those limitations which make the boundaries of the legislative power in every constitutional government — such limitations, for example, as that property shall not be taken without due process of law; that one man's property shall not be taken to be bestowed upon another man; that the ends of taxation shall be public and not private; that the apportionment of taxation shall not be arbitrary merely, and the like. Or, stated in another way, this sovereign power of classification for taxation is one whose boundaries are such, to here adopt the words of Chief Justice Marshall in *McCulloch* v. *Maryland*, 4 Wheat. 316, 428, that "the security against abuse of the power is found in the *structure* of the government itself."

The plain result of the proposition that the State's power and right of choice, in making classifications for taxation, is (aside from restraints in the state constitution) bounded only by the limitations which restrain the powers of legislation in every free government, is: that the classification of railroad property for taxation by itself, and without the right of deducting mortgage debts, is not in excess of legitimate classification for taxation, unless so to classify and tax is such a flagrant usurpation and injustice as to make it violative of the fundamental principles of property right as protected by all free governments.

Now, is the law of California, which the defence in the present case assails, of this flagrantly unjust character, or, on the other hand, is this discrimination complained of sanctioned by reason and justice?

Before answering the question, it is important to notice a common error — that these tax laws regard and deal with the natural persons, and their separate and private property, which make up these corporations, in their natural and individual, as distinguished from their associated and artificial, character and capacity, and that the legislature, in the very nature of the subject-matter, cannot, in imposing these taxes, regard the property invested in the corporations as in any other legal predicament or *status* than is an equivalent amount of similar property held by individuals as natural persons. The very opposite of this is the truth. These corporations are endowed by the State with most exceptional powers, rights, and franchises, and it is not just that their property should be classified for purposes of taxation precisely like all other property. For these corporations possess in connection with their holdings a species of property intangible, but of immense value, specially granted to them by legislative enactment, known as "franchises," which individuals do not have in respect to their holdings. It carries with it advantages of succession, perpetuity, etc., not enjoyed by individuals. It is the very life of these artificial persons.

They have the right of eminent domain; they have the privileges and immunities of common carriers; they come into being to conduct a special business intimately associated with the trade and commerce of the country, and the property they hold other than the franchise is only an incident to, or an instrumentality used as a means of making useful, this intangible yet most important part of their property, the "franchise." This franchise is inseparable from its ties, rails, etc., and it is impossible, certainly impracticable, to separate the one from the other in reaching its value; yet the fact that they were assessed together is one of the complaints made in this case. What it has in the shape of property has associated with it and inseparable from it that most valuable ele-

ment, the "franchise"; franchise and road-bed and rails, and so on, go to make up the property of this artificial person. And thus it is made necessary to group them all together for the purpose of assessment; and other property, having no such element, and no such condition, justly occupies a place as a distinct class.

Again: The State in the exercise of its sovereign power could not do otherwise than make this a distinctive class without doing one of two things, viz.: it must tax its citizens to the full value of the property held by them, respectively, irrespective of mortgages; or it must permit to escape taxation all railroad property embraced in franchises, road-bed, etc., that is mortgaged to its full value.

Such property of a railroad company, it cannot be denied, should be subjected to a tax, but it could not be liable to a tax upon the principle of making a division, such as is provided for, above referred to, because the holdings of the bonds secured render the collection of such a tax, if so assessed, impracticable, indeed impossible. These bonds are sold and held all over the world, as is shown by the history of such railroad bonds the world over, and are in this respect unlike all private mortgages. And so the alternative was presented either to oppress the citizen by imposing a tax on property that he only in part owned, or dividing property held under such dissimilar conditions into classes in their nature and constituent elements wholly distinct, and thereby making subject to taxation, property, which it in large part created by granting the franchise, and which without such classification would escape taxation.

Who can justly say that property, thus brought into being, can be relieved from all taxation because it has been mortgaged to its full value, unless citizens whose property is the result of their own endeavors, and in no part the gift of the sovereign, shall also be taxed to the full value regardless of encumbrances?

The contention of the defendant in this respect is, it seems to us, most conclusively answered by the court in the *State Railroad Tax Cases*, 92 U. S. 575; *Society for Savings* v. *Coite*,

6 Wall. 594; *State Freight Tax Cases*, 15 Wall. 232; *State Tax on Gross Receipts*, 15 Wall. 284. In this connection we also invite attention to the twenty-eighth finding, it being in substance set up in the answer. It is attempted by this to show a discrimination against the defendant by attempting to show that there are other corporations similarly situated where deductions are allowed. But an examination of the facts as alleged in the answer, and as found in this finding, shows that it falls very far short of accomplishing this.

*The next Question is, Is the Assessment an Attempt to take the Property of the Defendant without " Due Process of Law " ?*

This contention of the defendant rests upon the assertion that there is no notice given of the assessment; and that while in case of individuals in respect to assessment of their property notice and a hearing are provided for before the local or county Board of Equalization, no notice of assessment by or hearing is provided for, before the State Board of Equalization, which makes the assessment against corporations such as the defendant.

There is no complaint that all corporations of the same class as the defendant are not treated alike in this regard. The complaint is, that while notice is given to one class no notice is given to the other. *One class* is not dealt with precisely as property of corporations and individuals belonging to *another class.*

What constitutes notice, due process of law, has been fully considered by this court in *State Railroad Tax Cases*, 92 U. S. 575; *McMillen* v. *Anderson*, 95 U. S. 37; *Davidson* v. *New Orleans*, 96 U. S. 97; *Kentucky Railroad Tax Cases*, 115 U. S. 321.

Without entering into details here, it is sufficient to say that the statutes on which these decisions were made are, in all essential features, the same as the constitution and laws of California, in respect of making assessments. Undoubtedly, if the State has the right to make classes of property, it has the right to fix the methods of assessing property in these

respective classes, and it cannot be required to make these methods the same for all classes.

### Did the Defendant have Notice, etc. ?

1. The Constitution, § 1, article 13, provides that "'all property' in the State shall be taxed in proportion to its value, to be ascertained as provided by law."

2. Section 9 creates a State Board of Equalization.

3. Section 10 provides that the franchise, etc., of railroads operated in more than one county shall be assessed by the State Board.

So here was notice in the constitution that this property of this company would be assessed by this board as the legislature might provide.

Under the provisions of the law there was not only notice to the company, but an actual appearance. by the company before the Board, in the fact that it made answer as required by law, and not only an appearance as a party but in effect an appearance as a witness at a hearing, because it not only returned the amount of property it held, but also testified under oath as to the *value of the railway* as to which the return was made.

We most respectfully submit that to assert in the face of all this that the company had no notice and no opportunity to be heard, has no substantial foundation upon which to rest, either in fact or law. The cases cited place it beyond controversy that this is notice — "*due process of law.*"

### Does the Fourteenth Amendment affect this Case ?

That the classification that was made by the State is one that it could lawfully make if the Fourteenth Amendment had not been adopted must, we think, in the light of the authorities, be conceded, and therefore the next question is, Has that amendment destroyed that right to thus classify?

We insist that that amendment has no relation to this power of the State to impose taxes; that it does not *enlarge* the *restrictions* upon the State, which we have above stated; that,

so far as the power to tax is concerned, the amendment leaves the power of the State just where it found it.

What led to the adoption of this amendment and what it was intended to accomplish, its "pervading spirit," never can be more forcibly stated than in the language of this court in the *Slaughter House Cases*, 16 Wall. 36. The substance of that "pervading spirit," as there declared by the court, is to confer citizenship on the negro race, just released from bondage, and to prohibit hostile discrimination against the race; and that this amendment might be safely trusted to prohibit such slavery as Mexican peonage or Chinese cooley labor, and that "in any fair and just construction" of any phrase or section of the amendments this "pervading spirit" must be looked to. See also *Strauder* v. *West Virginia*, 100 U. S. 303; *Ex parte Virginia*, 100 U. S. 339; *Elk* v. *Wilkins*, 112 U. S. 94.

Assuming after the declaration of the Chief Justice in the *Santa Clara Case*, 118 U. S. 396, that the Fourteenth Amendment applies to these corporations, the question still remains whether they are to be considered as standing precisely on the same footing as natural persons. They are endowed with some qualities that a natural person cannot have, and they cannot be endowed with some qualities possessed by natural persons. They cannot hold office, nor vote, nor sit on juries, and the like, and the withholding of these privileges could not be depriving them of the equal protection of the laws, although these are conferred upon all other "persons."

And therefore, even if they are persons, they are only persons of their own class, and as such they are entitled only to have all, *of that class*, treated alike when the conditions are the same, or to be treated the same as natural persons when the conditions are the same.

And, if corporations are embraced as persons, there still remains the further question, is it a denial of the equal protection of the laws, if, having provided for notice as to assessments against individuals by county boards, the same notice is not provided in case of assessment of corporations by the State Board? and is it a denial of the equal protection of the laws to

allow a division between mortgagor and mortgagee in case of the individuals and deny it in case of corporations, for the purposes of taxation?

We insist that they are not embraced in this Amendment for any such purposes or considerations. Nothing could have been farther from the minds of the makers of that Amendment than the thought that it was in any way to interfere with the power of a State to regulate after its own methods, and according to its own discretion, the assessment and collection of taxes.

But it is contended now by this defendant that this language is so elastic that it can be stretched over all the affairs of corporations, and control the State in the exercise of its right of taxation as to such corporations.

We have already seen by the adjudications of this court how supreme and absolute is the power of a State as to taxation.

That it was a known and thoroughly recognized right, a right indispensable to its existence, a right which cannot be hampered or trammelled, except by the clearest prohibition by its only superior, the Constitution of the United States has been already established. And we most respectfully submit that the language well known to have been intended to subserve one purpose, "the pervading spirit" of which is to accomplish the purpose stated by the court, cannot, without violence, be used *to strike down a sovereign right of a State.*

Certainly such right of the State would not be held to be trespassed upon by the Constitution of the United States without the clearest provision. No doubtful or uncertain language could have that effect, and this is especially so in the matter now under consideration, because it is a right of such supreme importance, and because of the express reservation in favor of the States of all power not expressly delegated.

An analysis of the defence shows that it includes in it the following elements:

*First.* That owing to the prohibition in the Fourteenth Amendment against denying equal protection, no State can extend or deny to any owner or class of owners of property, held for private purposes, any exemption on account of the ability,

or lack of ability, of the owner to pay, or on account of the wants or condition of his family, or on *any* account which relates to the condition of the owner, which is not extended to all owners of private property.

*Second.* That in exercising its sovereign right of discretion and choice, regarding the subject, method, and rules of taxation, no State of the Union, since the adoption of the Fourteenth Amendment, holds any power to regard or treat any railroad property, not actually used in operating the road, as being, for the purposes of taxation, "*affected*" by the supremely valuable franchises and powers bestowed, by the State, upon such railroads.

*Third.* That although the States may, notwithstanding the Fourteenth Amendment, exempt from taxation all property held by private owners for the purposes of education, religion, or charity, this because the benefits which these do to the State may be received as equivalent to the taxes remitted, yet the State may not deny to railroads any exemption from taxations on account of the enormously valuable franchises, rights, privileges, and immunities which these derive, by gift, from the State; nor yet on account of the exceptional burdens, damages, etc., which these roads inflict upon the State and its citizens.

That each of these three propositions is in conflict with reason, the practices of all the States, and with authority, seems to be exceedingly plain.

Take, for example, the matter of the right and the propriety of the legislature, looking to the *condition* of the taxpayer, in determining upon his taxation and his exemptions.

All States have found it wise to encourage the immigration of skilled artisans, artificers, manufacturers, and the like by securing to them exemption from certain classes of taxation which the State has found necessary to impose upon the majority of the people. Now it is alleged that the Fourteenth Amendment has rendered this also unlawful. All States have found it wise to encourage the professions of teachers in literature and the useful arts and in religion; and have accordingly exempted these from certain taxes which are

imposed upon the majority of the people. This discrimination in favor of teachers and professors and ministers of religion, it is alleged, is now rendered unlawful by this Fourteenth Amendment. The Sta,es have found it wise to assess against certain very lucrative pursuits and professions exceptional taxes, and have therefore subjected the profession of the law, and many other exceptionally lucrative pursuits, to taxation not imposed upon other pursuits. This, too, it is alleged, the Fourteenth Amendment has rendered unlawful. Most, if not all, new States have found it wise to exempt from taxation the new-comers settling in such States for a period of time, this on account of the hardships incident to the beginning of life in new places. All this is rendered unlawful by this Fourteenth Amendment. All States have found it essential to exempt from certain taxes persons who are in exceptionally dependent or helpless or necessitous conditions, such as the poor, having not exceeding a designated amount of property, widows having dependent upon them for support children, and the like. Now this exemption is declared to be rendered unlawful by the Fourteenth Amendment.

All States which have granted to any of its citizens specially valuable monopolies or privileges, such as rights of wharfage, ferries, bridges and the like, have found it wise to assess against the owners of these, special and heavy contributions, in the nature of taxes, to the State. These taxes are alleged to be prohibited by the Fourteenth Amendment.

These are examples of the consequences which are to result from holding that the Fourteenth Amendment prohibits all discriminations, in taxation, based wholly or mainly on the character or condition of the owner of the property. And these illustrations also apply to the second proposition above named, to wit, that the Fourteenth Amendment prohibits discrimination, in taxing railroad property not actually used in exercising the corporate franchise. The laws taxing corporations as such, to which we have just alluded, have usually, and as a matter of practice, taxed the *entire* corporate property by the same rule of assessment, whether used in connection with the franchise or not.

The general rule upon this subject is thus stated in Cooley on Taxation, 145: "The general right to make exemptions is involved in the right to apportion taxes, and *must be understood to exist wherever it is not forbidden.*"

Reduced to its last analysis, the position taken here by the defendant, that the clause in the Fourteenth Amendment, securing equal protection, is one which *forbids* taxation of railroad property in a class by itself, and upon a mode of assessment different from that applied to natural persons, is a position which inserts in the constitution of every State of this Union a prohibition restraining the state legislatures from making just such classifications of property, for taxation, as have been made during the entire history of these States, and compels the legislature to adhere to one fixed iron rule in taxing all property, and this without regard to the dissimilarity of the subjects of taxation in the matters of the condition of the ownership thereof, the special emoluments, profits, and privileges enjoyed by such ownership, and regardless of all other differences in the condition of the property and of its ownership.

How radical will be the revolution which the insertion of such a provision in the constitutions of the States would be, becomes apparent by a glance at the tax systems of the States and at the kind of exemptions and distinctions which have been and are now tolerated by such tax systems.

The question presented by this record, whether or not this property is subject to taxation by the State by reason of its relations to the United States, can hardly, we submit, now be considered a debatable one.

This case certainly is not distinguishable from *Thomson* v. *Pacific Railroad Company*, 9 Wall. 579; *Peniston* v. *Railroad Company*, 18 Wall. 5; and *United States* v. *Union Pacific Railroad*, 98 U. S. 569, 619.

Upon the decision of this court in these cases we rely to maintain the right of the State to tax this property of the defendant involved in these assessments.

As to the point that the franchise was blended with the roadway, etc., in making the assessment in question, we reply:

1st. That it was a franchise granted by the State and not by Congress.

2d. That such a franchise is subject to taxation. *State Railroad Tax Cases*, 92 U. S. 603.

3d. And may be blended with capital stock. *Ibid.*

4th. If it may be blended with capital stock it may be blended with road-bed, roadway, etc., without which it is valueless, and without the franchise the road-bed, roadway, etc., have only the value of wood and iron. *Ibid.*

The usefulness of these depends upon the use of them in connection with each other — as a whole, and the wisdom of dealing with them as a unit has always been recognized. It was approved in the *Tax Cases*, in 92 U. S. If this defendant railroad property were to be sold under a foreclosure, no court would for a moment entertain the proposition to sell the road-bed, the roadway, the rolling-stock and the franchise separately, and especially would a proposition to sell the franchise apart from the road-bed, etc., not be entertained.

*Mr. George F. Edmunds, Mr. William M. Evarts,* and *Mr. Creed Haymond* for defendants in error.

*Mr. Harvey S. Brown* also filed briefs and an argument for defendants in error in Nos. 660, 661, 662, and 663.

*Mr. George A. Johnson,* Attorney General of California, closed for plaintiff in error.

MR. JUSTICE BRADLEY delivered the opinion of the court.

These cases are substantially similar to those of *Santa Clara County* v. *The Southern Pacific Railroad Company,* and the other cases decided at the same time, and reported in 118 U. S. 394. It will be unnecessary, therefore, to set out many provisions of the Constitution and laws of the United States and of California which are involved in the present cases in common with those referred to. The actions were brought by the State of California in the Superior Court for the county of San Francisco, and were removed into the Circuit Court of

the United States, where a jury was waived in each case, and the causes were tried by the court, whose findings of fact and conclusions of law are contained in the respective records. One of the cases (No. 660 on the docket) was brought against The Central Pacific Railroad Company for the recovery of the state and county taxes due upon the assessment of the company's property made by the State Board of Equalization for the year 1883 ; said assessment being $18,000,000, and the taxes amounting to $276,865.10, sixty per cent of which was tendered and paid without prejudice to either party after the suit was brought.    Another case (No. 1157) is an action against the same company for the taxes of 1884, due upon a like assessment of $24,000,000.   A third (No. 664), against the same company, is for the taxes of 1884, upon an assessment of $22,000,000.   No 661 is a similar action against The Southern Pacific Railroad Company for the taxes of 1883.   No. 662 is a similar action against the Northern Railway Company for the taxes of 1883.   No. 663 is a similar action against The California Pacific Railroad Company for the taxes of 1883. Tender and payment of sixty per cent of the taxes were made in all the cases except 1157, in which the amount tendered and paid was fifty per cent.   Similar defences were set up in these cases as in the cases reported in 118 U. S.   It was claimed, as in those cases, that in making the assessments no deduction was made for the mortgages on the companies' property, whilst such deduction was made on the property of other citizens, by assessing to the mortgagees the amount of the mortgages as an interest in real estate; thus discriminating against the company and denying to it the equal protection of the laws, contrary to the Fourteenth Amendment of the constitution.   It was also alleged in defence that the Board of Equalization included in the assessments a valuation of rights, franchises and property which they had no authority to assess ; as, for example, franchises granted to the companies by the United States, and ferry boats, fences and other property subject to be assessed by the local county boards and not by the state board ; and that the assessments were for aggregate amounts, not showing on their face what part of the valuation

represented the property illegally included therein; thus rendering the entire assessment in each case void. It was on this latter ground that the judgments for the defendants in the former cases were affirmed. If these defences, or either of them, are supported by the facts, it is unnecessary for us to decide the question raised under the Fourteenth Amendment of the constitution. The questions arising under that amendment are so numerous and embarrassing, and require such careful scrutiny and consideration, that great caution is required in meeting and disposing of them. By proceeding step by step, and only deciding what it is necessary to decide, light will gradually open upon the whole subject, and lead the way to a satisfactory solution of the problems that belong to it. We prefer not to anticipate these problems when they are not necessarily involved.

The ground on which it is alleged that the assessments in question were made to include property which the state board had no authority to assess, is to be found in article XIII, sections 9 and 10, of the state constitution. Those sections are as follows :

"SEC. 9. A State Board of Equalization, consisting of one member from each congressional district in this State, shall be elected by the qualified electors of their respective districts at the general election to be held in the year one thousand eight hundred and seventy-nine, whose term of office, after those first elected, shall be four years, whose duty it shall be to equalize the valuation of the taxable property of the several counties in the State for the purposes of taxation. The Controller of State shall be *ex-officio* a member of the board. The boards of supervisors of the several counties of the State shall constitute boards of equalization for their respective counties, whose duty it shall be to equalize the valuation of the taxable property in the county for the purpose of taxation : *Provided,* such state and county Boards of Equalization are hereby authorized and empowered under such rules of notice as the county boards may prescribe, as to the county assessments, and under such rules of notice as the state board may prescribe, as to the action of the state board, to increase or lower

the entire assessment roll, or any assessment contained therein, so as to equalize the assessment of the property contained in said assessment roll, and make the assessment conform to the true value in money of the property contained in said roll.

" Sec. 10. A l property, except as hereinafter in this section provided, shall be assessed in the county, city, city and county, town, township, or district in which it is situated, in the manner prescribed by law. The franchise, roadway, road-bed, rails, and rolling-stock of all railroads operated in more than one county in this State shall be assessed by the State Board of Equalization at their actual value, and the same shall be apportioned to the counties, cities and counties, cities, towns, townships, and districts, in which such railroads are located, in proportion to the number of miles of railway laid in such counties, cities and counties, cities, towns, townships, and districts."

The last section shows explicitly that, in regard to a railroad, the state board has power to assess only five things, the franchise, roadway, road-bed, rails and rolling-stock; the county boards are authorized to assess all the rest of the property. If the state board includes in its assessment any more of the railroad property than it is authorized to do, the assessment will be *pro tanto* illegal and void. If the unlawful part can be separated from that which is lawful, the former may be declared void, and the latter may stand; but if the different parts, lawful and unlawful, are blended together in one indivisible assessment, it makes the entire assessment illegal. This is so well settled that it needs no citation of authorities farther than to refer to the opinion of this court in the former cases: (118 U. S.) In the present assessments, all parts of the property are blended together and are inseparable. If it be true, therefore, that property not authorized to be included in the assessments is included therein, the assessments must be declared void.

The legislature of California, in passing laws for carrying out the principles and methods of taxation laid down in the Constitution, has deviated from its words, and has adopted some provisions which would seem to be a departure from it.

As the State Board of Equalization in making the assessments in question undertook to follow the law, it will be necessary to examine it. By § 3628 of the Political Code as amended in 1880, it was provided as follows:

"The franchise, roadway, road-bed, rails, and rolling-stock of all railroads operated in more than one county in this State shall be assessed by the State Board of Equalization as hereinafter provided for. Other franchises, if granted by the authorities of a county, city, or city and county, must be assessed in the county, city, or city and county within which they were granted; if granted by any other authority, they must be assessed in the county in which the corporations, firms, or persons owning or holding them have their principal place of business. All other taxable property shall be assessed in the county, city, city and county, town, township, or district in which it is situated. . . . The assessor must, between the first Mondays of March and July in each year, ascertain the names of all taxable inhabitants, and all property in his county subject to taxation, except such as is required to be assessed by the State Board of Equalization, and must assess such property to the person by whom it was owned or claimed, or in whose possession or control it was at 12 o'clock of the first Monday next preceding."

By § 3665 of the same code, as amended by the act of March 9th, 1883, it is, amongst other things, provided as follows:

· "The State Board of Equalization must meet at the State Capitol on the first Monday in August, and continue in open session from day to day, Sundays excepted, until the third Monday in August. At such meeting the board must assess the franchise, roadway, road-bed, rails, and rolling-stock of all railroads operated in more than one county. Assessment must be made to the corporation, person, or association of persons owning the same, and must be made upon the entire railway within the State, and must include the right of way, bridges, culverts, wharves, and moles upon which the track is laid, and all steamers which are engaged in transporting passengers, freights, and passenger and freight cars across waters

which divide the road. 'The depots, stations, shops, and buildings erected upon the space covered by the right of way are assessed by the assessor of the county wherein they are situate. Within ten days after the third Monday of August, the board must apportion the total assessment of the franchise, roadway, road-beds, rails, and rolling-stock of each railway to the counties or cities and counties in which such railway is located, in proportion to the number of miles of railway laid in such counties and cities and counties."

Here, it will be perceived, that the legislature undertakes to define what things are and what are not, comprised within the five categories of railroad property assessable by the state board, and declares that they include not only the entire railway within the State, the right of way, bridges and culverts, but also the "wharves and moles upon which the track is laid, and all steamers which are engaged in transporting passengers, freights, and passenger and freight cars across waters which divide the road. This is clearly an enlargement of the terms of the constitution. Steamers, at least, are not, and have been held by the Supreme Court of California not to be, embraced in the five categories.

Now, one of the grounds of defence set up by the Central Pacific Railroad Company in Nos. 660 and 1157, by the Northern Railway Company in No. 662, and by the California Pacific Railroad Company in No. 663, is, that the value of their steam ferry-boats was blended by the State Board of Equalization with the other values contained in the assessments. The Central Pacific Company, in its answers, (and the others contain similar averments,) says:

"The western terminus of the said railroad of defendant is in the city of San Francisco, on the west side of the Bay of San Francisco. The distance across said bay is five miles, and the whole thereof is part of the navigable waters of said bay. The cars of the company are transported from the end of the railroad track of said road on the eastern side of said bay to the end of the railroad track on the western side of said bay on steam ferry-boats belonging to the defendant, built, owned, and constructed for that purpose, and are of great

value. For more than four years past the defendant has been the owner of two steam ferry-boats, one of the tonnage of 1566 tons and one of the tonnage of 1012 tons, and during the whole of that time has used said boats for the purposes aforesaid. Said boats now are, and for more than four years last past have been, of a class which are by law required to be registered, and now are, and for more than four years last past have been, duly registered and enrolled in the city and county of San Francisco, State of California.

"The State Board of Equalization, in making said pretended assessment of the said roadway, road-bed, rails, and rolling-stock of defendant, did wilfully and designedly include in the valuation thereof the value of said boats, and the value of said boats is blended in said pretended assessment with the value of said roadway, rails, road-bed, rails, and rolling-stock, and there is no means by which such value can be separated from the valuation placed by said board upon said roadway, road-bed, rails, and rolling-stock, or either of them."

This allegation is sustained by the court below in its findings of facts in the cases referred to. The finding in 660, and substantially the same in the other cases, is as follows :

"That on the 18th day of August, 1883, the State Board of Equalization of the State of California, pretending to act under and by virtue of the powers conferred upon it by § 10 of article XIII of the constitution of the State of California, did make a pretended assessment for the purposes of taxation for the fiscal year of said State then next ensuing upon the franchise, roadway, road-bed, rails, and rolling-stock of said railroad against defendant. Said pretended assessment was not made separately upon the franchise, roadway, road-bed, rails, and rolling-stock, or any properties of said railroad, but all of said property was blended together in making said assessment, which assessment was then and there so entered upon the minutes of said board. Said assessment is the assessment upon which the several taxes mentioned in the complaint herein are based, and no other assessment than the aforesaid was ever made of said property or any part thereof for said fiscal year. Said assessment included all property and kinds

of property mentioned in § 3665 of the Political Code of California as amended March 9, 1883, except depots, stations, shops, and buildings erected upon the space covered by the right of way, which last-mentioned property was assessed, as provided in said section, by local assessors.

This is a clear affirmation of the allegation of the answer. Section 3665 of the Political Code, as amended March 9, 1883, requires the State Board of Equalization to include in their assessment of railroad property "all steamers which are engaged in transporting passengers, freights, and passenger and freight cars across waters which divide the road." It is a matter of public notoriety, as much so as the existence of the railroad itself, or that of the Sierra Nevada, or any other geographical feature on the route, that the railroad companies in the cases referred to have steam ferry-boats engaged in the transportation of passengers and freight across the bay of San Francisco and the straits of Carquinez; and that without such means of transportation those waters could not be crossed.

The question whether steamers and ferry-boats should be included in the property assessed by the State Board of Equalization, or in that assessed by the county board, was distinctly raised in the case of *San Francisco v. Central Pacific Railroad Company*, 63 Cal. 467, 469, and decided in favor of the county board. That was an action brought by the city and county of San Francisco against the company to recover taxes imposed upon it by virtue of an assessment made by the county board upon the same ferry-boats now assessed by the state board. The company resisted the tax on the ground that these boats were assessable by the state board, and not by the county board. The Supreme Court of California decided against the company. Its finding of facts was as follows, namely: "That the defendant is a corporation existing under the law of the United States, and of this State, . . . owner of a line of railroad known as the Central Pacific Railroad, extending from a point in the city of San Francisco . . . to Ogden in the Territory of Utah; that the length of said road in the city and county of San Francisco is four miles from a

point within said city to the eastern shore of the southern arm
of the bay of San Francisco; that from said point on the east-
ern shore . . . to a point on the western shore of said bay,
where the railway of defendant again commences, is about
twelve miles ; that across said bay no line of railroad has been
constructed ; and freight and passengers carried upon said road
are taken across said bay upon steam ferry-boats; . . . that
upon the decks of said vessels are laid railroad tracks, etc."
After giving judgment for the plaintiff upon these facts, the
court says : " The sole question presented for decision herein
is whether the steamers Thoroughfare and Transit, mentioned
in the above findings, are to be assessed by the assessor of the
city and county of San Francisco or by the State Board of
Equalization. The property to be assessed by the board is
defined in the 10th section of article IX [XIII] of the consti-
tution of 1879. It is the franchise, roadway, road-bed, rails,
and rolling-stock of all railroads operated in more than one
county in the State. All property other than the above-men-
tioned is to be assessed by the local assessors. Are the steam-
ers above named embraced within the category of property
named in the section above referred to ? The relation of such
steamers to the Central Pacific Railroad Company is set forth
in the findings." The court then proceeds to show that the
ferry-boats cannot be included in either of the five categories
mentioned in the constitution, namely, in either the franchise,
roadway, road-bed, rails, or rolling-stock ; and concludes as
follows : " We are of opinion that the assessment of the steam-
ers above mentioned pertained to the local assessor, and was
properly made by the assessor of the city and county of San
Francisco." This decision was made in June, 1883, and is a
construction of the constitution of California. It follows, that
the act of March 9th, 1883, as reproduced in § 3665 of the
Political Code, departs from the constitutional provision ; and
that the assessments, in following the act, are also unconstitu-
tional and void.

In No. 1157, one of the cases against the Central Pacific
Railroad Company, being for the taxes of the year 1884, the
court finds that the State Board of Equalization, in making

the assessment, did knowingly and designedly include in the valuation of the roadway, the value of fences erected upon the line between said roadway and the land of coterminous proprietors. This brings that case precisely within the decision made in the former cases reported in 118th United States Reports.

Another defence set up by the Central Pacific Railroad Company in the three cases against it, namely, Nos. 660, 664, and 1157, and by the Southern Pacific Railroad Company, in No. 661, is, that the State Board of Equalization included in their assessments in said cases the value of the franchises conferred upon said companies by the United States, which, it is contended, is repugnant to the constitution and laws of the United States, and therefore void. Thus, in No. 660, The Central Pacific Railroad Company, in its answer, after reciting the various acts of Congress conferring franchises and privileges and imposing duties upon the company, avers that it is a federal corporation, and holds its corporate powers and franchises under the government of the United States, and that the said government has never given to the State of California the right to lay any tax upon the franchise, existence, or operations of the company. Similar averments are made in the other cases, 664, 1157, and 661. The court finds in each of these cases that the assessment made by the State Board of Equalization included the full value of all franchises and corporate powers held and exercised by the defendant. The first question, then, is, whether the defendants in these cases held any franchises granted to them by the government of the United States. Of this there can hardly be a doubt.

The Central Pacific Railroad Company was constituted by the consolidation of two state corporations of California, but derived many of its franchises and privileges from the government of the United States. The findings of the court below on this subject are as follows, to wit:

"That on the 28th day of June, 1861, a corporation was formed and organized, under the laws of the State of California, under the corporate name of The Central Pacific Railroad Company of California. Said corporation was formed

for the purpose of constructing, owning, and operating a line of railroad and telegraph, commencing at the city of Sacramento in said State and running thence through the counties of Sacramento, Placer, Sierra and Nevada to the eastern boundary of said State, in the expectation that its proposed railroad would when constructed constitute part of a line of railroad extending from the Missouri River to the Pacific Ocean, which line it was then supposed was about to be constructed under the legislative supervision and authority of the government of the United States, and which line of railroad was afterwards so constructed.

"That on or about the 1st day of July, 1862, the government of the United States undertook to construct, or to cause to be constructed, a line of railroad from the Missouri River to the Pacific Ocean, and to that end Congress passed an act entitled 'An act to aid in the construction of a railroad from the Missouri River to the Pacific Ocean, and to secure to the government the use of the same for postal, military and other purposes.' 12 Stat. 489, c. 120.

"That to facilitate the construction of said road the government of the United States, by said act of Congress, conferred upon the said Central Pacific Railroad Company of California the same powers and clothed it with the same privileges and immunities which it conferred upon and clothed with the said Union Pacific Railroad Company, except that the said Central Pacific Railroad Company of California was to commence the construction of said railroad at the Pacific Ocean and build east until it met the said Union Pacific Railroad building west.

"That on or about the 2d day of July, 1864, Congress passed an act entitled 'An act to amend an act entitled An act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the government of the United States the use of the same for postal, military and other purposes,' approved July 1, 1862. 13 Stat. 356, c. 216.

"That said Central Pacific Railroad Company of California filed in the Department of the Interior its acceptance of the

terms and conditions of said act of Congress of July 1st, 1862, within the time therein designated.

"That on or about the 31st day of October, 1864, said Central Pacific Railroad Company of California sold and assigned all its rights under the aforesaid acts to a corporation then existing under the laws of the State of California, and known as the Western Pacific Railroad Company, so far as said rights related to the construction of said railroad and telegraph between the cities of San José and Sacramento, in said State of California. Said assignment was ratified and confirmed by the United States by an act of Congress passed on the 3d day of March, 1865, entitled ' An act to amend an act entitled An act to aid in the construction of a railroad and telegraph line from the Missouri River to the Pacific Ocean, and to secure to the government the use of the same for postal, military and other purposes, approved July 1st, 1862, and to amend an act amendatory thereof, approved July 2d, 1864.' 13 Stat. 504, c. 88.

"That the said line of railroad from the Pacific Ocean to Ogden, in Utah Territory, was completed and put in operation in 1869, and has been in operation from that time until the present, and still is in operation, and the whole of the railroad mentioned in the said acts of Congress has long since been completed, and is now, in accordance with the spirit and intent of said acts of Congress, operated as one continuous line from the Missouri River to the Pacific Ocean, and is so operated and maintained for the uses and purposes mentioned in said acts.

"That in August, 1870, acting under the said acts of Congress, said Central Pacific Railroad Company of California and the said Western Railroad Company formed themselves into one corporation under the name of the Central Pacific Railroad Company. Said company is the defendant herein, and has, from the completion of said railroad as aforesaid until the present time owned (except in the respect hereinafter stated) and operated said railroad under and by virtue of said acts of Congress and for the uses and purposes therein mentioned."

If we turn to the acts of Congress referred to by the court, we shall find that franchises of the most important character were conferred on this company. Originally, the Central Pacific Railroad Company of California had only power to construct a railroad from Sacramento to the eastern boundary of the State. Congress, by the act of 1862, authorized the company (in the words of the act) "to construct a railroad and telegraph line from the Pacific coast, at or near San Francisco, or the navigable waters of the Sacramento River, to the eastern boundary of California, upon the same terms and conditions, in all respects, as are contained in this act for the construction of said railroad and telegraph line first mentioned [the Union Pacific], and to meet and connect with the first mentioned railroad and telegraph line on the eastern boundary of California." Sec. 9. In the following section it was enacted, that, after the completion of its road to the eastern boundary of California, the Central Pacific might unite upon equal terms with the Union Pacific Railroad Company in constructing so much of said railroad and telegraph line and branch railroads and telegraph lines through the Territories, from the State of California to the Missouri River, as should then remain to be constructed, on the same terms and conditions as provided in relation to the Union Pacific Railroad Company. Thus, without referring to the other franchises and privileges conferred upon this company, the fundamental franchise was given by the acts of 1862 and the subsequent acts, to construct a railroad from the Pacific Ocean across the State of California and the Federal Territories until it should meet the Union Pacific; which it did meet at Ogden in the Territory of Utah. This important grant, though in part collateral to, was independent of, that made to the company by the State of California, and has ever since been possessed and enjoyed. The present company has it by transfer from, and consolidation of, the original companies, by which its existence and capacities were constituted. Such consolidation was authorized by the 16th section of the act of Congress of July 1st, 1862, and the 16th section of the act of July 2d, 1864, taken in connection with the 2d section of

the act of March 3d, 1865, referred to in the findings of the court. The last named act ratified the transfer by the Central Pacific to the Western Pacific of a portion of its road extending from San José to Sacramento, and conferred upon the latter company all the privileges and benefits of the several acts of Congress relating thereto, and subject to all the conditions thereof. If, therefore, the Central Pacific Railroad Company is not a federal corporation, its most important franchises, including that of constructing a railroad from the Pacific Ocean to Ogden city, were conferred upon it by Congress.

It cannot at the present day be doubted that Congress, under the power to regulate commerce among the several States, as well as to provide for postal accommodations and military exigencies, had authority to pass these laws. The power to construct, or to authorize individuals or corporations to construct, national highways and bridges from State to State, is essential to the complete control and regulation of interstate commerce. Without authority in Congress to establish and maintain such highways and bridges, it would be without authority to regulate one of the most important adjuncts of commerce. This power in former times was exerted to a very limited extent, the Cumberland or National road being the most notable instance. Its exertion was but little called for, as commerce was then mostly conducted by water, and many of our statesmen entertained doubts as to the existence of the power to establish ways of communication by land. But since, in consequence of the expansion of the country, the multiplication of its products, and the invention of railroads and locomotion by steam, land transportation has so vastly increased, a sounder consideration of the subject has prevailed and led to the conclusion that Congress has plenary power over the whole subject. Of course the authority of Congress over the Territories of the United States, and its power to grant franchises exercisible therein, are, and ever have been, undoubted. But the wider power was very freely exercised, and much to the general satisfaction, in the creation of the vast system of railroads connecting the East with the

Pacific, traversing States as well as Territories, and employing the agency of state as well as federal corporations. See *Pacific Railroad Removal Cases*, 115 U. S. 1, 14, 18.

Assuming, then, that the Central Pacific Railroad Company has received the important franchises referred to by grant of the United States, the question arises whether they are legitimate subjects of taxation by the State. They were granted to the company for national purposes and to subserve national ends. It seems very clear that the State of California can neither take them away, nor destroy nor abridge them, nor cripple them by onerous burdens. Can it tax them? It may undoubtedly tax outside visible property of the company, situated within the State. That is a different thing. But may it tax franchises which are the grant of the United States? In our judgment, it cannot. What is a franchise? Under the English law Blackstone defines it as "a royal privilege, or branch of the king's prerogative, subsisting in the hands of a subject." 2 Bl. Com. 37. Generalized, and divested of the special form which it assumes under a monarchical government based on feudal traditions, a franchise is a right, privilege or power of public concern, which ought not to be exercised by private individuals at their mere will and pleasure, but should be reserved for public control and administration, either by the government directly, or by public agents, acting under such conditions and regulations as the government may impose in the public interest, and for the public security. Such rights and powers must exist under every form of society. They are always educed by the laws and customs of the community. Under our system, their existence and disposal are under the control of the legislative department of the government, and they cannot be assumed or exercised without legislative authority. No private person can establish a public highway, or a public ferry, or railroad, or charge tolls for the use of the same, without authority from the legislature, direct or derived. These are franchises. No private person can take another's property, even for a public use, without such authority; which is the same as to say, that the right of eminent domain can only be exercised by virtue

of a legislative grant. This is a franchise. No persons can make themselves a body corporate and politic without legislative authority. Corporate capacity is a franchise. The list might be continued indefinitely.

In view of this description of the nature of a franchise, how can it be possible that a franchise granted by Congress can be subject to taxation by a State without the consent of Congress? Taxation is a burden, and may be laid so heavily as to destroy the thing taxed, or render it valueless. As Chief Justice Marshall said in *McCulloch* v. *Maryland*, "the power to tax involves the power to destroy." Recollecting the fundamental principle that the Constitution, laws and treaties of the United States are the supreme law of the land, it seems to us almost absurd to contend that a power given to a person or corporation by the United States may be subjected to taxation by a State. The power conferred emanates from, and is a portion of, the power of the government that confers it. To tax it, is not only derogatory to the dignity, but subversive of the powers of the government, and repugnant to its paramount sovereignty. It is unnecessary to cite cases on this subject. The principles laid down by this court in *McCulloch* v. *Maryland*, 4 Wheat. 316; *Osborn* v. *The Bank of the United States*, 9 Wheat. 738; and *Brown* v. *Maryland*, 12 Wheat. 419; and in numerous cases since which have followed in their lead, abundantly sustain the views we have expressed. It may be added that these views are not in conflict with the decisions of this court in *Thomson* v. *Pacific Railroad*, 9 Wall. 579, and *Railroad Co.* v. *Peniston*, 18 Wall. 5. As explained in the opinion of the court in the latter case, the tax there was upon the property of the company and not upon its franchises or operations. 18 Wall. 35, 37.

The taxation of a corporate franchise merely as such, unless pursuant to a stipulation in the original charter of the company, is the exercise of an authority somewhat arbitrary in its character. It has no limitation but the discretion of the taxing power. The value of the franchise is not measured like that of property, but may be ten thousand or ten hundred thousand dollars, as the legislature may choose. Or, without

any valuation of the franchise at all, the tax may be arbitrarily laid. It is not an idle objection, therefore, made by the company against the tax imposed in the present cases.

It only remains to consider whether the Southern Pacific Railroad Company, as well as the Central Pacific, was invested with any franchises derived from the government of the United States. Of this we think there can be no question. The court below, in its findings of fact in the Southern Pacific case, (No. 661,) finds that the defendant is a corporation existing under the laws of California, except in so far as its existence, rights, privileges, duties and obligations have been affected by various acts of Congress. It then describes the course of the defendant's road, which commences on the waters of the Pacific Ocean, in the city of San Francisco, and extends thence southerly to Tres Pinos, in the county of San Benito, from which place to Huron, a distance of forty or fifty miles, a portion of the road is yet unfinished, and the road of the Central Pacific company is temporarily used in its stead. From Huron the route of the road extends easterly to Goshen, and thence southerly to Mojave. At Mojave it separates into two main branches, one extending in an easterly direction to the Colorado River, near the 35th parallel of north latitude, where it meets and connects with the Atlantic and Pacific Railroad, leading to Springfield, in the State of Missouri: the other branch extends southerly to Los Angeles and thence easterly to Fort Yuma, and connects with the Southern Pacific Railroad of Arizona, and by means of other roads forms a continuous line to New Orleans. The findings then continue to state as follows, namely :

"That on the 27th day of July, 1866, the government of the United States undertook to construct or cause to be constructed a line of railroad from a point at or near the town of Springfield, in the State of Missouri, to the headwaters of the Colorado Chiquito, and thence along the thirty-fifth parallel of latitude, as near as might be found suitable for a railroad route to the Colorado River at such point as might be selected, and thence by the most practicable and eligible route to the Pacific Ocean, and to that end Congress passed an act entitled

'An act granting lands to aid in the construction of a railroad and telegraph line from the States of Missouri and Arkansas to the Pacific Ocean,' which act was approved on said 27th day of July, 1866, 14 Stat. 292, c. 278. By said act certain persons therein named were made and erected into a corporation under the name and style of the 'Atlantic and Pacific Railroad Company.'

"That to facilitate the construction of said road the government of the United States, by said act of Congress, adopted the defendant, [the Southern Pacific Railroad Company,] as the instrument or agent of the United States, and conferred upon defendant the same powers and clothed defendant with the same privileges and immunities which it conferred upon and clothed the Atlantic and Pacific Railroad Company with, except that the said defendant was to construct only that portion of said railroad between the Colorado River and the city and county of San Francisco.

"That said Atlantic and Pacific Railroad Company organized under said act, . . . and said company and defendant, immediately after the passage of said act, accepted the terms and conditions thereof and have duly complied therewith.

"That said Atlantic and Pacific Company has fully completed the whole of said road from Springfield to the Colorado River, and defendant has constructed said road as aforesaid to Mojave, with the exception hereinbefore set out.

"That on the 3d day of March, 1871, the government of the United States undertook to construct or cause to be constructed a line of railroad from Marshall, in the State of Texas, to San Diego, in the State of California, and from said line of road at the Colorado River to construct or cause to be constructed a line of railroad which would connect the road from Marshall to San Diego with the line of road provided for in the act of Congress of July 27th, 1866, hereinbefore referred to, and by means of said connecting road to connect the road from Marshall to San Diego with the city of San Francisco, and to that end Congress passed an act entitled 'An act to incorporate the Texas Pacific Railroad Company and to aid in the construction of its road, and for other pur-

poses,' approved March 3d, 1870, and subsequently, on the 2d day of May, 1872, passed an act entitled ' An act supplementary to an act entitled An act to incorporate the Texas Pacific Railroad Company and to aid in the construction of its road, and for other purposes,' approved March 3d, 1871. 16 Stat. 573, c. 122; 17 Stat. 59, c. 132.

" That immediately after the passage of said act of March, 1871, the Texas Pacific Railroad Company was organized in pursuance thereof, and it and defendant accepted all the terms and conditions of each of said acts of 1871 and 1872, and have fully and in every respect complied therewith and under them, and in compliance with the spirit and intent of said acts, have completed the roads mentioned in the third finding ": [to wit, the line of the defendant's railroads hereinbefore described.]

An examination of the acts referred to in these findings shows that Congress authorized the Southern Pacific Railroad Company to connect with the Atlantic and Pacific Railroad, at such point near the boundary line of the State of California, as it should deem most suitable for a railroad line to San Francisco, and, to aid in the construction of such a railroad line, Congress declared that the company should have similar grants of land, and should be required to construct its road on the like regulations, as to time and manner, with the Atlantic and Pacific. Like powers were also given to the Southern Pacific Railroad Company to construct a line of railroad from Tehachapa Pass, by way of Los Angeles, to the Texas Pacific road at the Colorado River (Fort Yuma). The Southern Pacific Company was not authorized by its original charter to extend its railroad to the Colorado River, as we already know by other cases brought before us, and as appears by the act of the state legislature passed April 4th, 1870, which assumed to authorize the company to change the line of its railroad so as to reach the eastern boundary line of the State; thus duplicating the power given to it by the act of Congress. (See the state act quoted in 118 U. S., p. 399.) This state legislation was probably procured to remove all doubts with regard to the company's power to construct such roads. It is apparent, however, that the franchise to do so was fully conferred by

Congress, and that franchise was accepted, and the roads have been constructed in conformity thereto.

It conclusively appears, therefore, that the Southern Pacific Railroad Company did receive from the United States government, and still enjoys, important franchises connected with its railroads.

It follows that in each one of the cases now before us, the assessment made by the State Board of Equalization comprised the value of franchises or property which the board was prohibited by the constitution of the State or of the United States from including therein; and that these values are so blended with the other items of which the assessment is composed that they cannot be separated therefrom. The assessments are, therefore, void. This renders it unnecessary to express any opinion on the application of the Fourteenth Amendment, as the result would not be different whatever view we might take on that subject.

*The judgments in all the cases are affirmed.*