WESTERN UNION TELEGRAPH CO. v. WRIGHT, Comptroller General.

(Circuit Court, N. D. Georgia. January 15, 1908.)

1. TAXATION—STATE TAXATION OF FOREIGN TELEGRAPH COMPANY—EFFECT OF FEDERAL STATUTE.

A telegraph company by its acceptance of Act July 24, 1866, c. 230, 14 Stat. 221 [U. S. Comp. St. 1901, p. 3579], permitting such companies to construct and operate their lines over any portion of the public domain and any military or post roads of the United States, derives no rights therefrom which exempts it from taxation by a state other than that in which it is incorporated in the same manner in which other foreign corporations doing business in the state are taxed, and it is immaterial that the tax imposed is designated by the state statute as a franchise tax.

[Ed. Note.—Of foreign corporations, see note to McCanna & Fraser Co. v. Citizens' Trust & Surety Co., 24 C. C. A. 13.]

2. SAME—INJUNCTION AGAINST ENFORCEMENT OF TAX—METHOD OF ASSESSMENT.

A federal court will not grant injunctive relief against the collection of taxes imposed by a state on a foreign corporation because of the methods adopted by a state board in arriving at the valuation of the property of the corporation unless in case of fraud or clearly shown adoption of a wrong principle.

In Equity. On motion for preliminary injunction.

Dorsey, Brewster, Howell & Heyman, for plaintiff.
John C. Hart, Atty. Gen., for defendant.

NEWMAN, District Judge. This bill is brought by the complainant against the defendant to enjoin the collection of a certain franchise tax which has been assessed against it, and which, as alleged in the bill, the Comptroller General is endeavoring to enforce against it for the year 1907.

The Legislature of Georgia, in 1907, passed an act to provide for and require the payment of taxes on franchises, and prescribed the method of return and payment of said taxes, which act was approved December 17, 1902. Acts Leg. Ga. 1902, p. 37. In 1903 the Comptroller General demanded of the complainant company the return of

its franchise for taxation, to which the complainant replied that it owned no franchise of value which was taxable under the laws of Georgia, and that the only franchise owned, used, or enjoyed by it in the state of Georgia was the franchise conferred by the terms of the act of Congress of July 24, 1866, c. 230, 14 Stat. 221 [U. S. Comp. St. 1901, p. 3579]. That act is as follows:

"An Act to Aid in the Construction of Telegraph Lines, and to Secure to the Government the Use of the Same for Postal, Military, and Other Purposes.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled. that any telegraph company now organized, or which may hereafter be organized, under the laws of any state of this Union, shall have the right to construct, maintain and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States which have been or may hereafter be declared such by act of Congress, and over, under, or across the navigable streams or waters of the United States: Provided, that such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel on such military or post roads. And any of said companies shall have the right to take and use from such public lands the necessary stone, timber, and other materials for its posts, piers, stations, and other needful uses in the construction, maintenance and operation of said lines of telegraph, and may pre-empt and use such portion of the unoccupied public lands subject to pre-emption through which its said lines of telegraph may be located as may be necessary for its stations, not exceeding forty acres for each station; but such stations shall not be within fifteen miles of each other."

"Sec. 2. And be it further enacted, that telegraph communications between the several departments of the government of the United States and their officers and agents shall, in their transmission over the lines of any of said companies, have priority over all other business, and shall be sent at rates to be annually fixed by the Postmaster-General.

"Sec. 3. And be it further enacted that the rights and privileges hereby granted shall not be transferred by any company acting under this act to any other corporation, association, or person: Provided, however, that the United States may at any time after the expiration of five years from the date of the passage of this act, for postal, military, or other purposes, purchase all the telegraph lines, property, and effects of any and all of said companies at an appraised value, to be ascertained by five competent disinterested persons, two of whom shall be selected by the Postmaster-General of the United States, two by the company interested, and one by the four so previously selected.

"Sec. 4. And be it further enacted, that before any telegraph company shall exercise any of the powers or privileges conferred by this act, such company shall file their written acceptance with the Postmaster-General, of the restrictions and obligations required by this act." 14 Stat. 221, Rev. St. § 5263 et seq. [U. S. Comp. St. 1901, p. 3579].

The complainant filed its written acceptance of this act in the manner required on June 12, 1867.

Notwithstanding this claim of exemption by the complainant from taxation of its franchise, the Comptroller General persisted in his demand, and the matter was submitted to arbitration in 1903. The arbitrators found the value of the physical property of the complainant, and also of the franchise, but attached to their finding the following:

"In fixing the value of the franchise under which the Western Union Telegraph Company constructed and maintains and operates its lines of telegraph in Georgia, we have been unable to designate or set apart the value of the federal franchise under which the testimony shows the company operates in Georgia, and our finding is therefore based upon and includes the value of the franchise conferred by the act of Congress of June, 1866. Whether the com-

pany is or is not liable to taxation upon the value of the federal franchise is not a matter for the determination of this board, its function being merely to find the value of such franchise."

The complainant company appears to have paid the tax both on its tangible property and on its franchise for the year 1903, and the question of its liability for taxes on its franchise seems to have been a matter at issue all along since that time down to the year 1907 between it and the Comptroller General.

In the year 1907 the Comptroller General assessed the value of the complainant's tangible property in Georgia at $1,018,140, and, in addition thereto, assessed the value of complainant's franchise at $1,404,820. The complainant alleges that this assessment was greatly in excess of the value of all of its property in Georgia, and more than double the fair market value thereof. Within 20 days from the date of this assessment complainant requested an arbitration, and designated an arbitrator to act in its behalf. The Comptroller General designated a member of the Railroad Commission of Georgia as arbitrator on behalf of the state. An umpire seems to have been agreed upon over the protest of the complainant, and an award finally made, finding the value of the complainant's tangible property in Georgia to be $796,000, and the value of its franchise $950,000, and attaching to the award the same statement as was attached to the award in 1903, to the effect that the value of the franchise conferred by the act of Congress of June, 1866, was included in the award. It seems evident that the act of Congress of July 24, 1866, is referred to.

The complainant, before the filing of the bill, tendered to the state the taxes on the $796,000 of its tangible property, which it appears from statements made in argument has since been paid, but declined to pay the tax on its franchise and filed this bill. The complainant company is a corporation organized under the laws of the state of New York in the year 1856. The Comptroller General demurred to the bill, and on this demurrer argument has been heard, and the matter taken under consideration.

The main reason for complainant's contention that it is not liable to a franchise tax is based upon the act of Congress of July 24, 1866, set out above. The complainant has relied in argument mainly upon the case of California v. Railroad Co., 127 U. S. 1, 8 Sup. Ct. 1073, 32 L. Ed. 150, in which it is determined that a franchise granted by Congress is not taxable by the states. The Supreme Court of the United States has had before it in several cases the question as to how far the act of Congress of July, 1866, operated to prevent taxation of the Western Union Company by the states. The first case directly in point is that of the Western Union Telegraph Co. v. Massachusetts, 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790. The tax assessed by the state of Massachusetts against the complainant company was assessed, as appears from the opinion by Mr. Justice Miller, in this way:

"The tax assessed by the treasurer of the commonwealth of Massachusetts was based upon an estimate of $750,952 as the taxable value of the shares of the corporation apportioned to that state, the rate of taxation having been determined for that year—1885—at $14.14 for and upon each $1,000 of valuation.

The mode by which this taxable valuation was arrived at was this: The treasurer ascertained from the officers of the telegraph company that the valuation of its entire capital stock was $47,500,000, from which were deducted the credits proper to be allowed in determining the assessable value, leaving $38,723.924 as the total valuation of said stock liable to taxation. It was then ascertained that the total number of miles of line of said corporation in all the states and territories of this country was 146,052.60, of which 143,219.55 were without the limits of the commonwealth of Massachusetts, leaving 2,833.05 miles within its boundaries. Taking these figures, the treasurer of the state assessed the value of that portion of the capital stock of this company, which, under this calculation, would fall within the commonwealth of Massachusetts, at the sum of $750,952. The amount thus arrived at, at the rate of $14.14 upon each $1,000 of valuation, produced the sum of $10,618.46 as the amount of the tax claimed to be due and payable to the treasurer of said commonwealth by that corporation. This sum was demanded of the telegraph company, but it refused to pay the same. The answer of the defendant corporation set up that of its 2,833.05 miles of line within the state of Massachusetts more than 2,334.55 miles were over, under, or across post roads, made such by the United States, leaving only 498.50 miles not over or along such post roads, on which the company offered to pay the proportion of the tax assessed according to the mileage by the state authorities."

It is then stated that the main ground upon which the telegraph company resisted the payment of the tax was the act of July 24, 1866, referred to above—the same contention that is made here. Mr. Justice Miller then proceeds in the opinion:

"It is urged that this section, upon its acceptance by this corporation or any of like character, confers a right to do the business of telegraphing which is transacted over the lines so constructed over or along such post roads, without liability to taxation by the state. The argument is very much pressed that it is a tax upon the franchise of the company, which franchise being derived from the United States by virtue of the statute above recited cannot be taxed by a state, and counsel for appellant occasionally speak of the tax authorized by the law of Massachusetts upon this as well as all other corporations doing business within its territory, whether organized under its laws or not, as a tax upon their franchises. But by whatever name it may be called, as described in the laws of Masachusetts, it is essentially an excise upon the capital of the corporation. The laws of that commonwealth attempt to ascertain the just amount which any corporation engaged in business within its limits shall pay as a contribution to the support of its government upon the amount and value of the capital so employed by it therein. The telegraph company, which is the defendant here, derived its franchise to be a corporation and to exercise the function of telegraphing from the state of New York. It owes its existence, its capacity to contract, its right to sue and be sued, and to exercise the business of telegraphy, to the laws of the state under which it is organized. But the privilege of running the lines of wires 'through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States, * * * and over, under, or across the the navigable streams or waters of the United States,' is granted to it by the act of Congress. This, however, is merely a permissive statute, and there is no expression in it which implies that this permission to extend its lines along roads not built or owned by the United States, or over and under navigable streams, or over bridges not built or owned by the federal government, carries with it any exemption from the ordinary burdens of taxation."

The opinion then proceeds further, as follows:

"While the state could not interfere by any specific statute to prevent a corporation from placing its lines along these post roads, or stop the use of them after they were placed there, nevertheless the company receiving the benefit of the laws of the state for the protection of its property and its rights is liable to be taxed upon its real or personal property as any other person

would be. It never could have been intended by the Congress of the United States, in conferring upon a corporation of one state the authority to enter the territory of any other state and erect its poles and lines therein, to establish the proposition that such a company owed no obedience to the laws of the state into which it thus entered, and was under no obligation to pay its fair proportion of the taxes necessary to its support."

After some further discussion and citation of authorities, this language is used:

"The tax in the present case, though nominally upon the shares of the capital stock of the company, is in effect a tax upon that organization on account of property owned and used by it in the state of Massachusetts, and the proportion of the length of its lines in that state to their entire length throughout the whole country is made the basis for ascertaining the value of that property. We do not think that such a tax is forbidden by the acceptance on the part of the telegraph company of the rights conferred by section 5263 of the Revised Statutes, or by the commerce clause of the Constitution."

It seems clear from the foregoing opinion that it would have been immaterial if the tax imposed by the state of Massachusetts had been in direct terms a tax upon the franchise of the company, so far as any rights it could set up under the act of July, 1866. The company's franchise, says the opinion, "to be a corporation, and to exercise the function of telegraphing," was derived from the state of New York. That which was conferred by the act of Congress of July, 1866, was permissive merely, and does not carry with it any exemption from the ordinary burdens of taxation. This question was next before the Supreme Court in the case of Massachusetts v. Western Union Tel. Co., 141 U. S. 40, 11 Sup. Ct. 889, 35 L. Ed. 628, in which the case in 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790, was referred to, the opinion quoted from, and the decision reaffirmed. In Postal Telegraph Co. v. Adams, 155 U. S. 688, 15 Sup. Ct. 360, 39 L. Ed. 311, the case of Western Union Tel. Co. v. Massachusetts, 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790, and the case of Massachusetts v. Western Union Tel. Co., 141 U. S. 40, 11 Sup. Ct. 889, 35 L. Ed. 628, are considered and again reaffirmed. In Western Union Tel. Co. v. Taggart, 163 U. S. 1, 16 Sup. Ct. 1054, 41 L. Ed. 49, in the opinion by Mr. Justice Gray, the Massachusetts cases are again referred to, and this language is used in reference thereto:

"These decisions clearly establish that a statute of a state requiring a telegraph company to pay a tax upon its property within the state, valued at such a proportion of the whole value of its capital stock as the length of its lines within the state bears to the length of all its lines everywhere, deducting a sum equal to the value of its real estate and machinery subject to local taxation within the state, is constitutional and valid, notwithstanding that nothing is in terms directed to be deducted from the valuation, either for the value of its franchises from the United States, or for the value of its real estate and machinery situated and taxed in other states; unless there is something more showing that the system of taxation adopted is oppressive and unconstitutional."

This case is cited with approval in Adams Express Co. v. Ohio, 166 U. S. 194–221, 17 Sup. Ct. 604, 41 L. Ed. 965.

In Western Union Tel. Co. v. Gottlieb, 190 U. S. 412, 23 Sup. Ct. 730, 47 L. Ed. 1116, the Supreme Court again, speaking through Mr.

Justice McKenna, refers to the Massachusetts case in 125 U. S. 530, 8 Sup. Ct. 961, 31 L. Ed. 790, stating:

"The laws of Massachusetts imposed a tax upon the Western Union Telegraph Company on account of the property owned and used by it within that state, the value of which was ascertained by comparing the length of its lines within the state with the length of its entire lines. The tax was sustained. The act of July, 1866, was urged against the tax as it is urged here. That the contention of the company in that case was, as it is in this, that it did not derive its existence from the taxing state but from the state of New York; that it did not do business in the taxing state by permission of that state, but by virtue of being an instrument of interstate commerce; that its rights and privileges and franchises were conferred by the United States and constituted it an agent of the United States, and as such agent it was exempt from the tax imposed. The contentions were rejected. The court did not test or measure the power of the state by the name which its laws gave the tax."

He then quotes the language of Mr. Justice Miller in the Massachusetts case, which has been quoted above.

Mr. Justice McKenna closes the discussion of that branch of the case as follows:

"These cases establish that in estimating the value of the property of a telegraph company situate within a state it may be regarded not abstractly or strictly locally, but as a part of a system operated in other states, and that the state was not precluded from taxing the property because the state had not created the company or conferred franchise upon it, or because it derived rights or privileges under the act of July, 1866, or was engaged in interstate commerce."

From the foregoing it would seem that the Supreme Court has clearly determined that the Western Union Telegraph Company derived no rights by virtue of the act of July, 1866, which prevent it from being subject to taxation in the various states, just as other foreign corporations would be; that this company derives its right to do business and to collect tolls (its most important right) from its charter granted by the state of New York; that its right to erect poles, etc., by virtue of the act of Congress of July, 1866, is permissive merely, and that in this act there is nothing which gives it an exemption from state taxation. Therefore the tax assessed against the company by the state of Georgia must be otherwise objectionable to entitle it to any relief here.

The only other ground stressed in the bill and in argument to entitle the complainant to relief in this case is this: It is alleged that the Railroad Commissioner named by the Comptroller General to act as arbitrator for the state threatened, if the arbitrator appointed by the Western Union Company did not agree to a particular individual as umpire, that no other would be agreed upon, and that it would be left for the Governor of the state, under the statute, to select an umpire, after 30 days. The bill leaves the matter in doubt just here, as to precisely what was done as to this, but the bill indicates that the company's arbitrator agreed to the umpire suggested by the state's arbitrator, as there is no statement that the Governor made an appointment. The matter suggested does not seem to justify any action here. The board proceeded to make an award. The award reduced very considerably the amount assessed by the Comptroller General against the company. It reduced the assessment on tangible property from

158 F.—64

$1,018,140 to $796,000, and the assessment on the company's franchise from $1,404,820 to $950,000. Upon what basis, or by what process, these amounts were reached by the arbitrators is not shown in the bill. If it was intended to reach the value of the property of the company in Georgia by taking the proportion of the mileage of the company in Georgia to the entire mileage, and thus reaching a basis for the valuation of that part of the company's capital properly taxable in Georgia, the rule would be followed so frequently approved by the Supreme Court of the United States. Whether the fact was taken into consideration that the tangible property of the company and its intangible property were being taxed separately does not appear from the bill, but the inference must be, in the absence of some statement to the contrary, that the arbitrators followed the law, and made proper allowances and deductions in this respect. In the absence of clear allegation showing fraud, matters of this kind, however, would not justify interference by the court.

In Railway Co. v. Babcock, 204 U. S. 585, 27 Sup. Ct. 326, 51 L. Ed. 636, it appears that bills had been filed to declare void the assessment of taxes made by the State Board of Equalization and Assessment of the state of Nebraska for the year 1904 against the Chicago, Burlington & Quincy and Union Pacific Railroads. In delivering the opinion of the court, Mr. Justice Holmes said:

"The dominant purport of the bills is to charge political duress, so to speak, and a consequent scheme of fraud, illustrated by the specific wrongs alleged, and in this way to make out that the taxes were void."

After discussing the case, the opinion sustaining the dismissal of the bills in the Circuit Court concludes with this reference to the State Board of Equalization and Assessment:

"Within its jurisdiction, except as we have said, in the case of fraud or a clearly shown adoption of wrong principles, it is the ultimate guardian of certain rights. The state has confided those rights to its protection, and has trusted to its honor and capacity as it confides the protection of other social relations to the courts of law. Somewhere there must be an end. We are of opinion that, whatever grounds for uneasiness may be perceived, nothing has been proved so clearly and palpably as it should be proved, on the principle laid down in San Diego Land & Town Co. v. National City, 174 U. S. 739, 754, 19 Sup. Ct. 804, 43 L. Ed. 1154, in order to warrant these appeals to the extraordinary jurisdiction of the Circuit Court."

Upon the whole I am satisfied that there is nothing in this bill to justify the interposition of this court, and entitle the complainant to the writ of injunction. The matter mainly pressed, as has been stated, was the right of the complainant under the act of Congress of July, 1866. This claim has been thoroughly disposed of by the decisions of the Supreme Court referred to adversely to the claim, and any other grounds of equitable relief set up in the bill are insufficient for the reasons hereinbefore stated.

The prayer for an injunction pendente lite must be denied, and the temporary restraining order heretofore granted dissolved.