434

PORTLAND TERMINAL COMPANY

*vs.*

LEO P. HINDS, FRED S. JORDAN AND ANDREW JACKSON,
ASSESSORS OF THE CITY OF PORTLAND.

Cumberland.    Opinion, October 8, 1936.

*Edward W. Wheeler,*
*William B. Skelton,*
*Perkins & Weeks,* for appellant.
*Harry C. Wilbur,*
*Eben Winthrop Freeman,* for appellees.

Sitting: Sturgis, Barnes, Thaxter, Hudson, Manser, JJ.

Thaxter, J.   This case is before the Court on exceptions to certain rulings of a Justice of the Superior Court dismissing an appeal of the Portland Terminal Company from a decision of the assessors of the City of Portland refusing to abate certain taxes assessed against the company for the year 1934. It is unnecessary to consider the three exceptions in detail as the rulings attacked all relate to one general question.

The Portland Terminal Company, a railroad corporation, by legislative authority acquired by deed in 1911 all the rights which the Boston and Maine Railroad had in the property here involved. The Boston and Maine Railroad had been authorized by Priv. & Special Laws 1871, Chap. 630, to extend its line from Berwick or South Berwick to Portland and to maintain and operate such extension. In so doing it was to have all the rights, powers, privileges and immunities and be subject to the liabilities and duties of similar railroad corporations under the laws of this state. Pursuant to such authority and in the exercise of the right of eminent domain granted by R. S. 1871, Chap. 51, Sec. 2, it acquired the lands here in question. There are eleven different parcels all of which with the exception of a part of the first the appellant claims are exempt from taxation under the provisions of R. S. 1930, Chap. 13, Sec. 4, on the ground that they are within the located right of way of the railroad. This particular land was acquired for depot grounds, side-tracks, storage tracks, repair shops, freight houses and for such other uses as are vital to the operation of a railroad terminal. All of the land is outside of the four-rod strip referred to in R. S. 1930, Chap. 63, Sec. 24; and the tax on it, which was paid under protest, amounted to $4,025.58.

The statutory provisions with which we are here concerned are as follows:

R. S. 1930, Chap. 13, Sec. 4:

"The buildings of every railroad corporation or association, whether within or without the located right of way, and its lands and fixtures outside of its located right of way, are subject to taxation by the cities and towns in which the same

are situated, as other property is taxed therein, and shall be regarded as non-resident land."

R. S. 1930, Chap. 63, Sec. 24:

"A railroad corporation for the location, construction, repair, and convenient use of its road may purchase, or take and hold, as for public uses, land and all materials in and upon it; through woodland and forest the land so taken shall not exceed six rods in width unless necessary for excavation, embankment, or materials, and through all land other than woodland and forest, the land so taken shall not exceed four rods in width unless necessary for excavation, embankment, or materials."

The decision of this question, which is of importance to both parties to this litigation, hinges on the interpretation of the words "located right of way" as used in R. S. 1930, Chap. 13, Sec. 4, *supra*.

Counsel for the City of Portland contend that the "located right of way" is limited to the four-rod strip referred to in R. S. 1930, Chap. 63, Sec. 24, and that accordingly all land outside of it is taxable. Counsel for the appellant claims that "the located right of way" comprehends all lands which the railroad corporation has appropriated and holds for public use under the exercise of its power of eminent domain for its authorized and essential purposes. Under such interpretation there would be included land taken for side-tracks, spur tracks, freight and passenger yards, stations, grounds, and approaches to stations, repair shops, storage warehouses, in fact for any of the uses for which the railroad is authorized to take lands under the provisions of R. S. 1930, Chap. 63, Sec. 26.

A consideration of the history of these statutory provisions is of great aid in determining their meaning. The earliest enactment is just a century old. P. L. 1836, Chap. 204. It reads in part as follows:

"Rail Road Corporations, which have been, or may be granted, shall have the right to take and hold so much of the Land, and other real estate of private persons, as may be

necessary for the location, construction, and convenient operation of their Rail Roads; and they shall, also, have the right to take, remove, and use for the construction and repair of said Rail Roads and appurtenances, any earth, gravel, stone, timber, or other materials, on or from the land so taken,— *Provided, however,* that said land, so taken, shall not exceed four rods in width, except, where greater width is necessary for the purpose of excavation, or embankment."

This, with the exception of a modification which does not concern us, is substantially the same as R. S. 1930, Chap. 63, Sec. 24. It was enacted at a time when terminal yards were unheard of, when the business of a railroad was largely the transportation of passengers, and the ground which it occupied was a narrow strip of land comparable to a highway. In fact, damages for the taking of such land were to be assessed by the county commissioners in the same manner as was by law provided in the case of the assessment of damages for laying out highways.

P. L. 1845, Chap. 165, repealing P. L. 1845, Chap. 159, Sec. 3, provided for the taxation of the real estate of railroads in the same manner as other real estate was taxed but the track and the land on which it was laid was exempt.

These provisions were incorporated in the revision of the statutes in 1857. R. S. 1857, Chap. 6, Sec. 4; Chap. 51, Sec. 2.

It is apparent that at that time what would now be called the "located right of way" of the railroad was the four-rod strip referred to in the statutes. For all purposes which were then essential this constituted the railroad itself. As railroads were then run, what land might be held outside of this area was of small consequence. It is apparent that Section three of Chapter 51 which provided for the filing of the location of the railroad with the county commissioners referred to nothing but the four-rod strip. By 1865, however, it had become apparent that, if railroads were to handle the increasing traffic, they must control more land outside of the original location. In that year by P. L. 1865, Chap. 21, they were given the right to take by eminent domain additional land for depot purposes; but the provisions with respect to tax exemption remained as before.

The revision of the statutes in 1871 contained important changes. R. S. 1871, Chap. 51, Secs. 1-6. Section 2 reads in part as follows:

> "A railroad corporation, for the location, construction and convenient use of its road, for necessary tracks, side-tracks, depots, wood sheds, repair shops, and car, engine and freight houses, may purchase or take and hold, as for public uses, land and all materials in and upon it; but the land so taken shall not exceed four rods in width for the main track of the road unless necessary for excavation, embankment or materials; but shall not take, without consent of the owners, meeting houses, dwelling houses, or public or private burying grounds."

It is significant that, under the provisions of Sections three and four which follow, a different procedure was provided for the taking of land for side-tracks and buildings and for the taking of land for the use of the main line. Land for such side-tracks and buildings could be taken by eminent domain only after application to the railroad commissioners and after their certification that such land was necessary for the business of the company. Land for the so called main line referred to in the act as the "roadway" could be taken by filing the location with the county commissioners and obtaining their approval. This distinction is important because it shows that the legislature, though including in one section all the land which the railroad could take by eminent domain for its necessary purposes, did not intend that all such land should be treated in the same manner. The provisions with respect to taxation remained as before; and the only property exempt was the track and the land on which it was built. R. S. 1871, Chap. 6, Sec. 4.

Bearing in mind the fact that up to this time the legislature had consistently differentiated between land acquired for the main line or roadway of the railroad and that taken for other purposes, let us consider the changes in taxation which became effective in 1881. We find at this time the first use of the words "located right of way." P. L. 1881, Chap. 91, Sec. 1, provided as follows:

> "The buildings of every railroad corporation or association, whether within or without the located right of way, and

its lands and fixtures outside of its located right of way, shall be subject to taxation by the several cities and towns in which such buildings, land and fixtures may be situated, as other property is taxed therein."

The subsequent sections required the payment by railroads of an excise tax to the state treasurer, which with the tax provided in Section one above was in lieu of all taxes upon said railroad, its property and its stock.

The conclusion seems inescapable that, in using the words "located right of way" at this time, the legislature intended to refer to the four-rod strip which had been regarded as the right of way, roadway, or main line of the railroad. It exempted that from taxation but not the buildings on it. Such land as it might take for sidetracks, depots, and buildings outside of this strip was clearly intended to be taxed.

In the revision of the statutes of 1883, the amendment of 1881 was incorporated, R. S. 1883, Chap. 6, Sec. 9; but there is a significant rearrangement of the provisions of R. S. 1871, Chap. 51, Sec. 2, relating to the taking of land for railroad purposes. R. S. 1883, Chap. 51, Sec. 14, provided for the taking of land for the location, construction, repair and convenient use of the road. Then followed Section 15, which provided for the filing of the location with the county commissioners. Then in Section 16 we find the provision for the acquiring land for other purposes and for the approval of such taking by the railroad commissioners.

Counsel for the railroad argue that this rearrangement was not intended to change the statute as it was enacted in 1871 when all these provisions were included in one section. With this conclusion we agree, but with the contention that the statute as it existed in 1871 made no differentiation between land taken for the main track and land taken for other purposes, we disagree. We are convinced that the legislature in making the rearrangement in 1883 merely intended to make more definite what had at all times prior thereto been the distinction between land included within the four-rod strip and land outside of it.

The course of this legislation to 1883 indicates that the legislature at all times, both with respect to the method of acquiring land

by railroads and to the taxation of it, distinguished between the four-rod strip or main line of the railroad and land outside of it. When in 1881 the words "located right of way" were used as designating such land as should be exempt from taxation, the intent was to refer to the four-rod strip which was then regarded as the railroad right of way. The statute as it existed in 1883 has come down to us through the revisions of 1903, 1916 and 1930 substantially intact, and what it meant then it means today. The fact that railroad business may have so changed as to make advisable a different rule is a matter with which the Court is not concerned. Nor is the fact that railroads are subject to an excise tax of any consequence, for such tax, by the very terms of the act imposing it, is to be in addition to that provided by Section four of Chapter thirteen with which we are here concerned.

Furthermore it must be borne in mind in construing this statute that taxation is the rule and exemption the exception and that the intention to exempt property from taxation must be expressed in clear and unambiguous language. *Portland, Saco & Portsmouth R. R. Co.* v. *City of Saco*, 60 Me., 196; *Inhabitants of Mechanic Falls* v. *Millett*, 121 Me., 329, 117 A., 93.

Counsel for the appellant have cited numerous cases which they claim hold that a railroad right of way is the entire tract of land which a railroad owns or is entitled to use for railroad purposes. It is difficult to generalize from cases in other jurisdictions, for we are concerned with the meaning of words used in a particular statute of our own. A glance at the cases cited will indicate this.

*St. Louis, R. C. & C. R. Co.* v. *Wabash R. Co.*, 152 Fed., 849, was not a case relating to taxation but concerned the interpretation of a decree of court under which one railroad claimed the right to use the tracks and terminal facilities of another. It was perfectly obvious from the terms of the decree that the Court intended to give such right.

In *Chicago, Milwaukee & St. Paul Railway Company* v. *Cass County*, 8 North Dakota, 18, 76 N. W., 239, the Court held that under a statute authorizing the taxing of "the franchise, roadway, roadbed, rails, and rolling stock of all railroads" side-tracks, turn outs, connecting tracks, station houses, freight houses and other accommodations were included.

*Pfaff, Auditor* v. *The Terre Haute and Indianapolis Railroad Company,* 108 Ind., 144, 9 N. E., 93, is substantially the same.

In the case of the *Chicago and Alton Railroad Company* v. *The People ex rel Joseph Dennison Collector,* 98 Ill., 350, it is perfectly apparent that for purposes of taxation the intention was to include within the railroad right of way all the land owned by the railroad and the buildings on it.

In *St. Louis Iron Mountain & Southern Railway Company* v. *Miller County,* 67 Ark., 498, 55 S. W., 926, 927, the Court specifically points out that the statute by its very terms designated that the right of way should "include all grounds necessary for side tracks, turn outs, depots, shops, water stations, and other necessary buildings."

Not one of these cases is an authority for holding that the exemption from taxation of the "located right of way" includes all land held by a railroad for public use and for its essential structures.

Counsel further cite the case of *In re Maine Central Railroad Co.,* 134 Me., —, 183 A., 844, where the incidental statement is made that "A railroad location, but not the buildings on it, it is true, is exonerated from local taxation." The Court clearly was there referring to the "located right of way" as defined in the opinion and not to any lands outside of such area.

Numerous cases have been cited by counsel for the City of Portland, the opinions in which indicate that ordinarily a railroad right of way does not include side-tracks, freight depots and similar terminal facilities.

In *Akers* v. *The United New Jersey Railroad and Canal Company,* 43 N. J. L., 110, the question was what constituted the "road of the defendants as constructed on their right of way as located." The opinion says, page 111 : "It seems to me that the prosecutors justly insist that this expression denotes the strip of land, of prescribed width, upon which the defendants have their routes of railway, and does not include mere side tracks or spurs, which are but appendages of their railway, designed to reach freight depots or engine-houses, or such other incidental structure. This, I think, is the idea which would ordinarily be gathered from the language."

In *Smith* v. *The Missouri Pacific Railway Company*, 90 Kan., 757, 136 P., 253, the question was what constituted the right of way of a railroad as such word was used in the Kansas constitution. The Court held that lands acquired for side-tracks, depots, work-shops and such other facilities were no part of the right of way unless included within the one-hundred-foot strip which the legis-lature had designated as the route of the proposed railroad.

In *San Francisco and San Joaquin Valley Railway Company* v. *City of Stockton*, 149 Cal., 83, 84 P., 771, the question was as to the validity of a tax assessment. The city had assessed the railroad on certain land on which had been built sidings, spur tracks, round houses, machine shops, and similar buildings. The constitution of the state provided that "the franchise, roadway, roadbed, rails and rolling stock" should be assessed by the state board of equalization. The railroad contended that the term "roadway" included such side-tracks, and the land devoted generally to railroad uses. The Court held that "roadway" was synonymous with "right of way" and that the property was properly assessed by the city. The Court said, page 91 : "The only remaining class of property named in the constitutional provision is 'roadway.' According to the ordinary and popular meaning of this term as applied to railroads, it in-cludes simply the continuous strip of land, within which the rail-road is constructed. This Court has said that it is synonymous with 'right of way,' and includes 'whatever space of ground the company is allowed by law in which to construct its roadbed and lay its track.' (*San Francisco* v. *Central Pacific R. R. Co.*, 127 U. S., 1, [8 Sup. Ct., 1073]), which is but another way of saying that it is the continuous strip of land, not exceeding in width the nine rods permitted by law (Civ. Code, sec. 465, subd. 4), which the company acquires and uses for the construction and maintenance of its road-bed and railroad track."

When we consider the history of this railroad legislation of our own state, it is apparent that in the mind of the legislature the right of way of the railroad was at all times regarded as something distinct from its terminal facilities and from property acquired for incidental purposes. The methods prescribed for its taking and location were different from those designated for the taking of

property for general purposes. When the legislature exempted from local taxation land within the located right of way, it seems clear that there was no intent to exempt such property as is here involved, and that the right to tax land employed for terminal facilities outside the four-rod strip was in the local communities. Such being the construction which we place on the legislative enactments here involved, we hold that the decision of the presiding Justice dismissing the appeal of the railroad from the assessment of this tax was correct.

The conclusion to which this Court has come renders it unnecessary for us to comment on the further claim of the City of Portland that no legal location was ever made of certain of the parcels of land here involved.

*Exceptions overruled.*

Dunn, C. J., took no part in the decision of this case.